No. 82–2148.  WHISENHUNT ET VIR *v.* SPRADLIN ET AL. C. A. 5th Cir.  Certiorari denied.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

This case raises important and recurring questions concerning the due process and privacy rights of public employees, and I therefore dissent from the denial of certiorari.  Petitioners, a patrolwoman and a police sergeant, were suspended from their jobs, and the sergeant was demoted to patrolman, because they dated and spent several nights together.  These punishments were imposed even though the Department failed to provide petitioners with any reasonable warning that their conduct was prohibited and did not come forward with any evidence that the activity adversely affected their job performance.  The Court of Appeals rejected petitioners' contentions that the suspensions and demotion violated their constitutional rights.  *Shawgo* v. *Spradlin*, 701 F. 2d 470 (CA5 1983).

Although issues concerning the regulation of the private conduct of public employees arise frequently, the lower courts have divided sharply both in their results and in their analytic approach,[1]

---

[1] See, *e. g., Andrade* v. *City of Phoenix*, 692 F. 2d 557 (CA9 1982); *Andrews* v. *Drew Municipal Separate School Dist.*, 507 F. 2d 611 (CA5 1975), cert. dism'd as improvidently granted, 425 U. S. 559 (1976); *Fisher* v. *Snyder*, 476 F. 2d 375 (CA8 1973); *Scott* v. *Macy*, 121 U. S. App. D. C. 205, 349 F. 2d 182 (1965); *Drake* v. *Covington County Board of Education*,

and guidance from this Court is unquestionably needed.   I would grant certiorari and set the case for oral argument.

## I

Petitioners Janet Shawgo[2] and Stanley Whisenhunt met and began dating while both were with the Amarillo, Tex., Police Department.[3]   Whisenhunt was a sergeant who had been on the force for 11 years; Shawgo was a patrolwoman who had joined the Department a year earlier.   The two worked different shifts, and Shawgo was not under Whisenhunt's supervision.   As their relationship developed, Whisenhunt informed his immediate supervisor, Lieutenant Boydston, that he and Shawgo would probably be spending some nights together.   The lieutenant told Whisenhunt that that would be "fine, [but] that I didn't want the two of them setting up housekeeping."   Petitioners spent an increasing amount of time together but, as directed by Lieutenant Boydston, maintained separate residences.

Sometime thereafter, respondent Chief of Police Lee Spradlin heard rumors about petitioners' relationship.   Without confront-

---

371 F. Supp. 974 (MD Ala. 1974) (three-judge court); *Briggs v. North Muskegon Police Dept.*, 563 F. Supp. 585 (WD Mich. 1983); *Baron v. Meloni*, 556 F. Supp. 796 (WDNY 1983); *Swope v. Bratton*, 541 F. Supp. 99 (WD Ark. 1982); *Suddarth v. Slane*, 539 F. Supp. 612 (WD Va. 1982); *Shuman v. City of Philadelphia*, 470 F. Supp. 449 (ED Pa. 1979); *Wilson v. Swing*, 463 F. Supp. 555 (MDNC 1978); *Smith v. Price*, 446 F. Supp. 828 (MD Ga. 1977), rev'd on other grounds, 616 F. 2d 1371 (CA5 1980); *Hollenbaugh v. Carnegie Free Library*, 436 F. Supp. 1328 (WD Pa. 1977), aff'd, 578 F. 2d 1374 (CA3), cert. denied, 439 U. S. 1052 (1978) (MARSHALL, J., dissenting); *Major v. Hampton*, 413 F. Supp. 66 (ED La. 1976); *Mindel v. U. S. Civil Service Comm'n*, 312 F. Supp. 485 (ND Cal. 1970).   See also *Phillips v. Bergland*, 586 F. 2d 1007, 1011 (CA4 1978); *Norton v. Macy*, 135 U. S. App. D. C. 214, 217, 417 F. 2d 1161, 1164 (1969); *Meehan v. Macy*, 129 U. S. App. D. C. 217, 229–230, 232, 392 F. 2d 822, 834–835, 837 (1968), on reconsideration, 138 U. S. App. D. C. 38, 425 F. 2d 469, on rehearing en banc, 138 U. S. App. D. C. 41, 425 F. 2d 472 (1969); *Taylor v. U. S. Civil Service Comm'n*, 374 F. 2d 466, 469–470 (CA9 1967).

[2] Subsequent to the decision below, petitioners were married and Shawgo has adopted her husband's last name.   For convenience, Mrs. Whisenhunt will be referred to herein by her previous name.

[3] The statement of facts is adopted from the opinion of the Court of Appeals. *Shawgo v. Spradlin*, 701 F. 2d 470, 472–474 (CA5 1983).

ing them or their supervisors, Spradlin ordered Department detectives to conduct surveillance of the two police officers during off-duty hours. For 17 days, the detectives monitored Whisenhunt's home from a car parked in front of it and from a nearby apartment rented for that purpose. During that period, they observed Shawgo entering and leaving Whisenhunt's apartment on a number of occasions. The detectives filed an investigative report with Chief Spradlin which detailed the times of Shawgo's off-duty visits but also noted that petitioners had maintained separate residences.

On the Chief's recommendation, the Department disciplined petitioners for their nonmarital "cohabitation." Both were suspended without pay for 12 days; in addition, Whisenhunt was demoted from sergeant to patrolman. When notified of the punishments, petitioners were informed that their relationship violated § 113, Part 8, of Police Department regulations, which prohibits conduct that, "if brought to the attention of the public, could result in justified unfavorable criticism of [an officer] or the department." Whisenhunt was told that his activities also violated § 123 of the regulations, which requires "diligent and competent" performance of duties that are not "otherwise specifically prescribed" in the rules, as well as city personnel Rule XIX, § 108, which proscribes "conduct prejudicial to good order." No Amarillo police officer had ever before been disciplined for dating or "cohabitation" on these or any other grounds.

Petitioners exercised their statutory right to challenge the discipline before the Amarillo Civil Service Commission. The Commission refused to hear evidence of other known but unpunished instances of dating and cohabitation among members of the Police Department. There were no charges, evidence, or findings that the relationship violated any state law;[4] that it affected the performance of petitioners' duties; or that it was known to any members of the public. The Commission nevertheless upheld the discipline. Both officers subsequently resigned from the force

---

[4] The Texas Penal Code expressly excludes from its sexual offense provisions "the conduct of persons while cohabitating, regardless of the legal status of their relationship and of whether they hold themselves out as husband and wife." Tex. Penal Code Ann. § 21.12 (1974). In addition, Texas has no statute prohibiting fornication.

because of unsatisfactory working conditions created by the discipline and publicity resulting from the hearing.

Petitioners brought this action in Federal District Court under 42 U. S. C. § 1983 against Chief Spradlin, the city, the Police Department, and members of the Amarillo Civil Service Commission. The complaint alleged that the discipline violated petitioners' rights to privacy and to due process of law. After a trial, the District Court entered judgment in favor of the defendants in an unpublished opinion and the Court of Appeals affirmed. *Shawgo* v. *Spradlin*, 701 F. 2d 470 (CA5 1983).

## II

Petitioners contend that, since they had no way of knowing that their private and otherwise lawful behavior violated the regulations quoted above, the discipline was imposed without due process of law. The Court of Appeals characterized this claim as "extremely persuasive":

> "[Whisenhunt] did not receive warning of the consequences of off-duty behavior that was a common practice at the Department and was expressly or tacitly approved by his supervisor. The actual conduct for which he was punished—dating and spending the night with a co-employee—is not self-evidently within the ambit of the regulations and thus does not carry with it its own warning of wrongdoing, as does illegal conduct . . . . In addition, the plaintiff here had no objective indication that his off-duty activities impaired his job effectiveness.
>
> "Moreover, the catchall regulation had not been given content by prior instances of discipline, for 'the conduct resulting in their suspension was virtually identical to conduct previously tolerated.' . . . The plaintiff had no notice, because he was the first officer disciplined for activities that were approved by his supervisor and that he had valid reasons to believe were common in the police force. In addition, by knowingly tolerating similar activities by other individuals, the Department may be seen as sanctioning conduct that could have fallen within the scope of the rule. . . . Whisenhunt's supervisor's express or tacit approval, the implicit sanctioning of similar behavior in the Department, and the absence of warnings or prior instances of punishment, all raised a reason-

able inference contradictory to the scope later ascribed to the general rule." *Id.*, at 478 (citations omitted).

Despite this conclusion, the Court of Appeals held that the rules afforded petitioners constitutionally sufficient notice that their conduct was prohibited. The court apparently believed that, in cases not involving criminal sanctions, formal administrative rule-makings, or activities protected by the First Amendment, the Due Process Clause imposes virtually no requirement of fair warning. See *id.*, at 477–478, 479.

I believe this assumption fundamentally misperceives the purpose of the due process notice requirement. We have long recognized that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926). See also *Kolender* v. *Lawson*, 461 U. S. 352, 357–358 (1983). The requirement that the government afford reasonable notice of the kinds of conduct that will result in deprivations of liberty and property[5] reflects a sense of basic fairness as well as concern for the intrinsic dignity of human beings. Furthermore, the rule is instrumental to the constitutional concept of "ordered liberty." By demanding that government articulate its aims with a reasonable degree of clarity, the Due Process Clause ensures that state power will be exercised only on behalf of policies reflecting a conscious choice among competing social values; reduces the danger of caprice and discrimination in the administration of the laws; and permits meaningful judicial review of state actions. See, *e. g., Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972); *Giaccio* v. *Pennsylvania*, 382 U. S. 399, 402–404 (1966); *Raley* v. *Ohio*, 360 U. S. 423, 437–439 (1959); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 532 (1952) (Frankfurter, J., concurring); *Cantwell* v. *Connecticut*, 310 U. S. 296, 307–308 (1940); *Hurtado* v. *California*, 110 U. S. 516, 535–536 (1884). See generally *McGautha* v. *California*, 402 U. S. 183, 248–259 (1971) (BRENNAN, J., dissent-

---

[5] The Court of Appeals recognized that Whisenhunt, at least, was deprived of a constitutionally protected property interest when he was demoted from sergeant to patrolman. 701 F. 2d, at 476. See also *infra*, at 971–972.

ing), and cases cited therein; Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 80–81 (1960).

The concern with arbitrary encroachments on freedom which underlies the notice requirement naturally has special force when the liberty interests at stake are fundamental. For this reason, we have demanded greater precision in laws which render conduct criminal or which may abridge First Amendment rights. See, e. g., *Kolender* v. *Lawson, supra,* at 358, and n. 8; *Parker* v. *Levy,* 417 U. S. 733, 756 (1974); *Smith* v. *Goguen,* 415 U. S. 566, 573, n. 10 (1974); *Winters* v. *New York,* 333 U. S. 507, 515 (1948). See *infra,* at 971. But the protections of the Due Process Clause are not limited to the most severe deprivations of liberty and property. As the Court held long ago, the requirement of fair warning does not prohibit particular types of penalties but rather "exaction of obedience to a rule or standard which [is] so vague and indefinite as really to be no rule or standard at all." *A. B. Small Co.* v. *American Sugar Refining Co.,* 267 U. S. 233, 239 (1925). Following the principle of *A. B. Small,* we have frequently entertained claims that regulations of economic and professional activity are unconstitutionally vague, even when the law at issue depends on civil enforcement and has no apparent effect on First Amendment rights. See, e. g., *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U. S. 489, 497–505 (1982); *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S. 35, 48–49 (1966); *Barsky* v. *Board of Regents,* 347 U. S. 442, 443, 448 (1954); *Neblett* v. *Carpenter,* 305 U. S. 297, 302–303 (1938).

The unexpected and ad hoc application of the city of Amarillo's vague personnel regulations to petitioners' conduct implicates precisely the concerns underlying the due process requirement of fair warning. There is not the slightest hint in either the language or the prior interpretations of the city's rules that they forbid private, off-duty, lawful, and consensual sexual relations. Whatever policy reasons may have justified the discipline, they had apparently never before been expressed by either the State, the city, or the Police Department. Indeed, as the Court of Appeals explained, petitioners had good reasons to believe that their relationship was *not* so proscribed. Upholding the discipline, therefore, is not merely unfair, it "sanction[s] the most indefensible sort of entrapment by the State." *Raley* v. *Ohio, supra,* at 438.

## III

For these reasons, I believe the discipline imposed on petitioners would have failed to satisfy the requirements of fair notice even if no fundamental rights had been at stake. But petitioners' lawful, off-duty sexual conduct clearly implicates the "fundamental . . . right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969). Without identifying the precise contours of this right, we have recognized that it includes a broad range of private choices involving family life and personal autonomy. See, *e. g.*, *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 426–427 (1983) (abortion); *Santosky* v. *Kramer*, 455 U. S. 745, 753 (1982) (child raising); *Zablocki* v. *Redhail*, 434 U. S. 374, 383–385 (1978) (marriage); *Carey* v. *Population Services International*, 431 U. S. 678, 684–685 (1977) (contraception); *Moore* v. *City of East Cleveland*, 431 U. S. 494, 499 (1977) (plurality opinion) (right to determine family living arrangements); *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639–640 (1974) (pregnancy); *Roe* v. *Wade*, 410 U. S. 113, 152–153 (1973) (abortion); *Eisenstadt* v. *Baird*, 405 U. S. 438, 453–454 (1972) (contraception); *id.*, at 460, 463–465 (WHITE, J., concurring in result); *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967) (marriage); *Griswold* v. *Connecticut*, 381 U. S. 479, 483–486 (1965) (marital privacy); *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944) (family relationships); *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541–542 (1942) (procreation); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925) (child rearing and education); *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923) (same). These and other cases reflect the view that constitutionally protected liberty includes freedom from governmental disclosure of or interference with certain kinds of intensely personal decisions. The intimate, consensual, and private relationship between petitioners involved both the "interest in avoiding disclosure of personal matters, and . . . the interest in independence in making certain kinds of important decisions," *Whalen* v. *Roe*, 429 U. S. 589, 599–600 (1977), that our cases have recognized as fundamental. Therefore, the notice requirement of the Due Process Clause demands particular precision in this case. See *supra*, at 970.

Indeed, because petitioners' conduct involved fundamental rights, it could only be abridged to the extent necessary to achieve

strong, clearly articulated state interests. See, *e. g.*, *Akron* v. *Akron Center for Reproductive Health, Inc.*, *supra*, at 427. The Court of Appeals concluded that petitioners' punishment served a hypothesized interest in "forbidding members of a quasi-military unit, especially those different in rank, to share an apartment or to cohabit." 701 F. 2d, at 483. Even assuming that this concern is sufficiently compelling to support explicit regulation of petitioners' off-duty sexual activities,[6] the city's deterrent purposes obviously cannot be rationally served by regulations that fail to warn officers that such conduct is forbidden. Cf. *Kelley* v. *Johnson*, 425 U. S. 238, 239, n. 1, 247–248 (1976) (promulgation of explicit rule regulating police officers' hairstyles is rationally related to goal of making officers readily recognizable and inculcating esprit de corps); *Arnett* v. *Kennedy*, 416 U. S. 134, 160 (1974) (opinion of REHNQUIST, J.) (longstanding constructions and availability of official interpretations gave content to personnel regulations).

Public employers in general, and police departments in particular, may well deserve considerable latitude in enforcing codes of conduct. See *Arnett* v. *Kennedy, supra; Parker* v. *Levy*, 417 U. S. 773 (1974). It is hard to understand, however, how such a code can be either fairly or effectively enforced when employees are not told the standards of conduct to which they are expected to conform.

---

[6] As noted above, Whisenhunt was not Shawgo's supervisor.