**Sandra Faye REDMOND, Plaintiff,**

v.

**CITY OF OVERLAND PARK, Overland Park Police Department, Myron E. Scafe, John Round, John Douglass, Jerry R. Wolfskill, Dr. Daniel Claiborn, Dr. Norman Heisler, and Dr. Sandra Radom, Defendants.**

Civ. A. No. 86–2217.

United States District Court,
D. Kansas.

July 21, 1987.

---

5. But see the decision of the ninth circuit in *Bancorp Leasing & Finance Corp. v. Agusta Avia-* tion, 813 F.2d 272, 277 (9th Cir.1987).

T. Clarence Harper, Washington, D.C., for plaintiff.

Stephen A. Murphy, Michael McCormic, Gage & Tucker, Overland Park, Kan., and John J. Yates, Rosalee A. Miller, Gage & Tucker, Kansas City, Mo., Patrick D. Gaston, Bennett, Lystle, Wetzler, Winn & Martin, Prairie Village, Kan., M. Warren McCamish, Timothy P. McCarthy, Williamson & Cubbison, Kansas City, Kan., James D. Conkright, Blackwell Sanders Matheny Weary & Lombardi, Overland Park, Kan., Barry W. McCormick, Bruce Keplinger, Thomas L. Griswold, Payne & Jones, Shawnee Mission, Kan., Robert Watson, City Atty., Legal Dept. of Overland Park, Kan., Rex Henoch, Turner and Boisseau, Michael G. Norris, Niewald, Waldeck, Norris & Brown, Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This action was brought by the plaintiff against the City of Overland Park [hereinafter "the City"], the Overland Park Police Department [hereinafter "the Department"] and various individuals; the case arises from the termination of plaintiff's employment as a police officer with the Department. Plaintiff's first amended complaint contained four counts: (1) invasion of privacy; (2) denial of due process; (3) conspiracy to violate the plaintiff's constitutional rights; and (4) libel and slander. The matter now comes before the court on various motions of the parties.

I. *Plaintiff's Motion for Leave to Amend.*

On February 17, 1987, the magistrate held the final pre-trial conference in this case. The final pre-trial order, as approved by this court, gave plaintiff until February 24, 1987, to file a motion to amend Count II of her complaint to delete allegations of denial of due process and to add a specific allegation against defendant Wolfskill. However, plaintiff's motion for leave to amend was not filed until March 25, 1987, almost thirty days late. Plaintiff's proposed second amended complaint also contains numerous amendments not provided for in the pre-trial order.

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend pleadings "shall be freely given when justice so requires." The United States Supreme Court has declared that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Among the factors to be considered are "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., futility of the amendment, etc." *Id.* The decision to grant or deny leave to amend is within the sound discretion of the court. *LeaseAmerica Corp. v. Eckel*, 710 F.2d 1470, 1473 (10th Cir.1983).

In her proposed amended complaint, Count II is changed from a due process claim to a claim of conspiracy to discriminate and racial discrimination. This change conforms the pleadings to the claims set forth in the final pre-trial order. The factual allegations in Count II are basically unchanged. However, the proposed complaint adds an allegation that defendant Wolfskill stated that plaintiff did not graduate from the Police Training Academy even though Wolfskill signed her certificate of graduation. Plaintiff has also attempted to add the Law Enforcement Training Center (LETC) as a defendant; plaintiff alleges that the LETC was defendant Wolfskill's employer.

Plaintiff's counsel have been less than diligent in filing motions and responses in this case, as evidenced by the late filing of plaintiff's motion for leave to amend and plaintiff's failure to file timely responses to

the multiple motions for summary judgment. Therefore, the court finds that only part of the plaintiff's proposed amended complaint should be allowed. Specifically, the court will allow plaintiff to amend Count II of her complaint to the extent of the claims set forth in the pre-trial order. Thus, the allegations of racial discrimination and conspiracy may be substituted for the due process claim. The additional factual allegations against Wolfskill may also be included.

However, plaintiff has made numerous other changes in her proposed amended complaint. She seeks to add the LETC as a defendant and has also changed various allegations throughout her complaint. The court finds that these amendments should not be allowed. As to plaintiff's request to add the LETC as a defendant, there is no evidence that the LETC was Wolfskill's employer as alleged. In fact, Wolfskill stated in his deposition that he worked for Johnson County Community College as director of the regional police academy. In light of Wolfskill's deposition testimony, the court sees no reason to allow plaintiff's amendment absent some showing from the record that the addition of the LETC would not be futile.

The remaining proposed amendments must also be denied. Plaintiff has failed to establish that allowing these amendments is in the interest of justice. In fact, these amendments are not even mentioned in the memorandum in support of plaintiff's motion for leave to amend. Finally, plaintiff has provided no explanation of the delay in seeking these amendments.

For these reasons, plaintiff's motion for leave will be granted only in part. Count II of plaintiff's complaint may be amended as proposed; all other amendments will be denied. Since plaintiff's amended claim is already included in the final pre-trial order, plaintiff will not need to file an amended complaint.

## II. *Motions for Summary Judgment.*

### A. *Factual Background.*

■ All defendants have filed motions for summary judgment; some of the defendants also have requested that the court impose sanctions against the plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure. Plaintiff has failed to file a timely response to any of these motions.[1] Therefore, the uncontroverted facts recited by the defendants are deemed admitted pursuant to Rule 15(c) of the Local Rules.

The uncontroverted facts, as gleaned from the pleadings,[2] affidavits, and depositions are as follows. Plaintiff was a probationary police officer with the City of Overland Park Police Department from December of 1984 until May 10, 1985. Plaintiff submitted an application for employment with the Department in 1984 while visiting Kansas. Plaintiff's application was favorably considered because of her apparent credentials and previous work experience with the United States Marshal's Office. In addition, plaintiff's race and sex were considered positive factors in the hiring process because of the City's affirmative action responsibilities. The Department performed a background investigation of the plaintiff, as it does with all new police officers. In order to conduct this investigation, the defendant John Douglass had to travel to Washington, D.C., and Virginia, where plaintiff had lived and was employed.

After completion of the background investigation and other hiring procedures,

1. Plaintiff's only response to the motions for summary judgment was in opposition to defendant Wolfskill's motion. According to the final pre-trial order, plaintiff was given until March 17, 1987, to file a response to Wolfskill's motion. However, plaintiff's response was not filed until March 25, 1987, and failed to specifically controvert Wolfskill's statement of facts as required by Local Rule 15(c).

The remaining defendants filed motions for summary judgment between April 14 and April 24, 1987. Plaintiff was given one thirty-day extension to respond to two of these motions. To this date, however, the plaintiff has failed to file any responses.

2. In addressing the defendants' motions for summary judgment, the court will rely on the claims as described in the final pre-trial order. The pre-trial order does include the amended claim in Count II.

the plaintiff was offered employment with the Department on or about November 30, 1984. Plaintiff was hired at a level of compensation which was five percent higher than that of other entry-level police officers because of the nature of her prior work experience. The Department paid at least part of the plaintiff's moving expenses from Washington, D.C., to Kansas. On December 4, 1984, plaintiff signed a statement indicating that she understood that her one-year probationary status would begin upon her graduation from the Recruit Academy.

The plaintiff was enrolled in the Police Training Program at Johnson County Community College from January 1985 through mid-April 1985. While a recruit in the police training program, the plaintiff heard the term "felony nigger rule." The record indicates that the plaintiff discussed this matter with Lieutenant Douglass in early January. The plaintiff told Douglass that her understanding of the "felony nigger rule" meant that any black person seen in Overland Park after midnight was to be stopped and checked. Defendant Douglass asked the plaintiff for the names of the persons giving her this information. Douglass informed the plaintiff that the term was coined by a former sergeant in reaction to a series of "smash and grab" burglaries that occurred in the late 1970's and early 1980's, for which a number of black youths were ultimately convicted. The plaintiff was also informed that at least one employee of the police department had been reprimanded both orally and in writing for using the term "felony nigger rule." The plaintiff refused to reveal the names of the persons who used the phrase in her presence. Plaintiff stated in her deposition that she was satisfied with the prompt action taken by Lieutenant Douglass on her report regarding use of the term "felony nigger rule." Plaintiff also admitted that Chief Scafe told her that the so-called "felony nigger rule" was not a policy or practice of the City or the Department.

Plaintiff received a certificate of graduation from the Police Training Program at Johnson County Community College, dated April 11, 1985, attesting that she had fulfilled the requirements set forth in Kansas House Bill 1137, § 8. The certificate of graduation was signed by defendant Jerry Wolfskill, the director of the Police Training Program. However, plaintiff did not satisfactorily complete her situational training, which was required for state certification, while enrolled in the Police Training Program. Plaintiff admitted that she had not completed her situational training and that she had been informed by defendant Wolfskill that she had not completed that training.

On May 1, 1985, defendant Wolfskill wrote a letter to Police Chief Scafe informing him that the plaintiff had not completed her situational training and that she could not be certified as a law enforcement officer in Kansas until she completed that training. The letter further stated that the plaintiff was required by law to complete the certification procedure within one year of employment as a police officer. Wolfskill also suggested in the letter two alternative means by which the plaintiff could complete the situational training and qualify for state certification.

During her first few months of probationary employee status and while at the academy, plaintiff's behavior and statements began to cause concern by her supervisors regarding her psychological fitness to serve as a police officer. First, in mid-December, plaintiff began complaining that she did not want to work in the patrol division. Plaintiff claimed that during her initial job interview, she had been promised by Lieutenant Roskoski that she would be assigned to the Investigations Division as a detective once she graduated from the academy. Plaintiff was advised that this assignment was highly unusual and that she must have misunderstood the lieutenant. The Department's usual procedure was to assign every new officer to the Patrol Division after completion of the academy program and then, after a successful tenure on patrol, that officer might be transferred to Investigations. Douglass suggested that the plaintiff discuss the matter directly with Lieutenant Roskoski

to clear up the apparent misunderstanding. However, plaintiff declined to follow this suggestion. A few days later, plaintiff told defendant Douglass that she had not only been promised an assignment in Investigations, but that she understood she was to work week days and have weekends off, and that she was to start at even a higher rate of pay than she was receiving. An investigation was conducted in regards to these complaints and they were found to be without merit.

Three other specific complaints or allegations by plaintiff concerning "suspicious activity" caused the concern about her mental well-being. In February of 1985, plaintiff complained that two suspicious subjects were watching her from a car parked in front of her apartment building. However, plaintiff filed no formal complaint in this matter and no investigation of the alleged incident occurred.

On February 20, 1985, plaintiff reported that on February 18 an unauthorized person had been in her apartment. This incident was investigated by the Department. The investigation revealed that the person in the apartment was Kim Steede, an HVAC mechanic working for a company which was under contract to the apartment complex where plaintiff lived. Steede admitted to investigating officers that he had been in plaintiff's apartment to check wiring at the request and with the knowledge of the apartment complex management. Plaintiff refused to accept the results of this investigation. She denied that Steede was the man in her apartment, even after she had a chance to observe him face-to-face. She later insisted that the man in her apartment was a member of the Lenexa Police Department, Mike Paisley. She continued to hold that belief, even after documents established that Mr. Paisley was working at the Lenexa Police Station at the time in question.

Plaintiff's final "suspicious" complaint was that some unknown person who fit the physical description of the Mayor of Overland Park, Ed Eilert, was following her in his car. This allegation was investigated and found to be unsubstantiated. Plaintiff

again refused to accept the results of the investigation and continued to insist that she was being followed by Mayor Eilert.

As a result of the foregoing incidents, the Department and, specifically, Chief Scafe developed a concern for plaintiff and her judgment, as well as her psychological fitness to serve as an armed police officer. The Department was concerned not only about the plaintiff's psychological well-being, but also about the potential civil liability of placing plaintiff on the street as a uniformed and armed police officer when the Department had knowledge of her "bizarre" statements and behavior.

As a result of these concerns, Chief Scafe decided to have plaintiff's psychological fitness for duty assessed by mental health professionals. Plaintiff was advised of this decision by Lieutenant Douglass and Captain Round. Plaintiff requested that the Department provide her with information in writing concerning the purpose of the additional psychological testing. In response to plaintiff's request, Captain Round provided plaintiff with letters dated April 12, 1985, and April 15, 1985, which described the purpose of the additional testing.

An appointment was made for the plaintiff on April 15, 1985, with Dr. Sandra Radom, a psychologist who had performed similar psychological evaluations of Overland Park police officers. Dr. Radom obtained a master's degree in psychology in 1977 and a Ph.D. in psychology in 1983. She began a practice in Missouri and was licensed in that state. In November of 1983, Dr. Radom began practicing in Kansas under the supervision of Dr. Daniel Claiborn at the Mission Psychology Group and Dr. Elizabeth Penick at the University of Kansas Medical Center. Under Kansas law, a psychologist licensed in another state must complete two years of supervised experience before being certified in Kansas. Dr. Radom was authorized, with such supervision, to perform psychiatric diagnostic interviews, test batteries, and render evaluations of individuals. Dr. Radom held herself out to the public as a Ph.D. psychologist "licensed as a psychologist in

Missouri and receiving supervision towards Kansas certification." Between 1977 and April 15, 1985, Dr. Radom had performed psychiatric diagnostic interviews at least fifty times and had performed the battery of psychological tests proposed for the plaintiff on numerous occasions. Dr. Radom had also performed psychological interviews, testing, and supplied evaluations on police officers at least fifty times prior to April 15, 1985. Some of these evaluations involved police officers from the City of Overland Park, including at least one white male. Dr. Radom's supervisor at the Mission Psychology Group was Dr. Daniel Claiborn. Dr. Claiborn received a master's degree in psychology from Vanderbilt University in Nashville, and a Ph.D. in psychology from the University of Missouri at Columbia. He has been practicing psychology since 1976 and has been licensed and practicing in the state of Kansas since 1980.

In the initial phone call from the Department setting up plaintiff's appointment in early April, it was suggested that Dr. Radom use Dr. Norman T. Heisler as the consulting psychiatrist. Dr. Heisler is and was a licensed psychiatrist in private practice. Dr. Radom and Dr. Heisler had previously worked together on psychological testing and evaluation of Overland Park police officers.

Dr. Radom met with Lieutenant Douglass and Captain Round prior to April 15 and was supplied basic documentation about the incidents that caused the concern on the part of the Department. It also appears that a report on plaintiff's earlier psychological testing by a Department psychologist was disclosed. At that meeting, neither police officer suggested any questions to ask the plaintiff, nor did they ask for any particular result. The defendants simply requested Dr. Radom's best professional judgment of the plaintiff's mental condition.

The plaintiff appeared for her scheduled appointment with Dr. Radom on April 15, 1985. The plaintiff was hostile and uncooperative during this interview. At the end of the interview, Dr. Radom proposed that plaintiff take a battery of tests. At that time, the plaintiff complained of cramps and an alternative date of April 17 was established for the taking of the tests. Thereafter, Dr. Radom spoke with Lieutenant Douglass and Captain Round. She informed them that the plaintiff had been hostile at the interview and that the testing had been postponed. Dr. Radom further stated that she was unable to render her professional opinion or evaluation at that time.

The plaintiff met with Dr. Heisler, the psychiatrist, on April 16, 1985. During that evaluation, the plaintiff refused to respond to many of the questions asked by Dr. Heisler. On April 17, the plaintiff called in to the Mission Psychology Group to cancel her appointment for that date. The testing was rescheduled for April 19. On the next day, April 18, Dr. Radom received a letter from plaintiff's attorney in Washington, D.C.; Dr. Radom considered this letter threatening in nature.

On April 19, the plaintiff came to the Mission Psychology Group and spoke with Dr. Radom's supervisor, Dr. Claiborn. At that time the plaintiff indicated that she did not like Dr. Radom and she was considering litigation. Dr. Claiborn told the plaintiff that the Mission Psychology Group would likely withdraw from the case. On or about April 21, Dr. Radom received another "threatening" letter from the plaintiff's attorney. On April 22, 1985, Dr. Radom and Dr. Claiborn wrote the Department indicating that they were withdrawing from the case. In the April 22nd letter, Drs. Claiborn and Radom recommended that the plaintiff be tested in a multi-disciplinary structured setting, such as a hospital, due to the concerns expressed by the plaintiff about receiving a fair evaluation. The record also discloses that the plaintiff signed a release of information form on April 22, 1985, allowing the Mission Psychology Group to release her records to the Department.

Dr. Heisler wrote to Lieutenant Douglass on April 20, 1985, stating that he could not send a report about the plaintiff until he had a release signed by her. The plain-

tiff signed a release on April 22, 1985. After the release was signed, Dr. Heisler sent to the Department a report that had been typed on April 20. Dr. Heisler reported that the plaintiff had refused to respond to many of his questions. Dr. Heisler further stated that since psychiatric evaluations relied almost exclusively on the clinical interview, he was unable to make any formal psychiatric diagnosis due to the plaintiff's lack of cooperation. Dr. Heisler did indicate that he had talked to the plaintiff long enough on April 16 to find her "at a symptom level—very hostile, guarded, and defensive." Dr. Heisler further reported that the possibility that these traits would interfere with her duties as a police officer could not be entirely excluded at that time. Finally, Dr. Heisler stated that he could not make a formal psychiatric diagnosis until additional testing had been completed, and that the additional testing would require more cooperation on the part of the plaintiff.

The only contact or conversation Dr. Claiborn had with anyone at the Department was one telephone call with Lieutenant Douglass or Captain Round stating that he and Dr. Radom were withdrawing from the evaluation of the plaintiff. The substance of all conversations between Dr. Radom and departmental officials, Dr. Claiborn and Dr. Elizabeth Penick, subsequent to the plaintiff's appointment on April 15, was regarding plaintiff's attitude, hostility and lack of cooperation at her original appointment. Neither Dr. Radom nor Dr. Claiborn performed any psychological testing on the plaintiff. Similarly, neither formulated any professional opinions, evaluations or conclusions concerning the plaintiff and no opinions, conclusions or evaluations about the plaintiff were conveyed, either orally or in writing, to the Department. Plaintiff stated in her deposition that she had no evidence, information or facts whatsoever to indicate that Dr. Claiborn or Dr. Radom rendered any opinions, conclusions or evaluations about the plaintiff to her employer. Plaintiff further stated that she had no evidence showing that Dr. Claiborn or Dr. Radom conspired with anyone to obtain confidential information about the plaintiff in violation of her right of privacy.

On or about May 17, 1985, plaintiff filed a complaint against Drs. Radom and Claiborn with the Kansas Behavioral Sciences Regulatory Board and the Attorney General's Office. Both governmental agencies investigated the plaintiff's allegations and subsequently dismissed the charges.

After the withdrawal of Drs. Radom and Claiborn, the Department attempted to secure other psychologists and psychiatrists to complete the evaluation of the plaintiff. The persons contacted by the Department indicated that they would not be willing to participate because of the impending threats of litigation made against Dr. Radom and Dr. Heisler. These individuals stated that they would not proceed with any evaluation of the plaintiff without an agreement from the City to fully indemnify them for all expenses incurred as a result of any litigation threatened by the plaintiff and her attorney. Because of plaintiff's lack of cooperation with, and threats of litigation against the doctors attempting to complete an evaluation, and the City's unwillingness to incur indemnification expenses to obtain other psychologists and psychiatrists, the Department decided to terminate the plaintiff's probationary status. This decision was based on the Department's lingering concerns regarding the plaintiff's psychological fitness to perform the duties of an armed police officer and the inability to resolve those concerns in a reasonable fashion. Consequently, plaintiff's probationary status employment was terminated by the City for the reason that she had not demonstrated her fitness to perform the duties of police officer. An affidavit by Police Chief Scafe indicates that the plaintiff's race was not a factor in the decision to terminate her probationary employment.

### B. *Rules for Summary Judgment.*

In considering the motions for summary judgment filed by the defendants, the court must examine all the evidence in the light most favorable to the plaintiff. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1

(10th Cir.1981). According to the federal rules, summary judgment is proper only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this rule, the initial burden is on the moving party to show the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). The moving party's burden may be met when that party identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at ——, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

Once the moving party has met these requirements, the burden shifts to the party resisting the motion. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The party resisting the motion "may not rest upon the mere allegations or denials of his pleadings ..." to avoid summary judgment. *Id.* The mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Id.* at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 213 (quoting *Improvement Company v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)).

### C. *Plaintiff's Privacy Claims.*

From what the court can glean from plaintiff's amended complaint and the final pre-trial order, plaintiff alleges that various defendants violated and conspired to violate her constitutional right to privacy in violation of 42 U.S.C. § 1983.[3] Specifically, plaintiff alleges that defendants Scafe, Round and Douglass turned over "private personnel files" regarding the plaintiff to defendants Heisler and Radom without the plaintiff's consent. Plaintiff further alleges that Heisler and Radom supplied information and opinions about the plaintiff to the police officials without her consent. The City and Dr. Claiborn (supervisor of Dr. Radom) are also named as defendants in this claim, based on a respondeat superior theory.

█ As a preliminary matter, the court finds that the City is entitled to summary judgment on these claims. A municipality may be held liable under section 1983 for constitutional violations if the complainant proves that the City officially implemented a policy, ordinance or regulation causing the constitutional deprivation, or if the City permitted such deprivations through an established custom. *Monell v. Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). However, a municipality will not be liable under section 1983 solely on a respondeat superior theory. *Id.* at 691, 98 S.Ct. at 2036. *See also Brown v. Reardon*, 770 F.2d 896, 900–01 (10th Cir.1985). Plaintiff's only allegation against the City in these claims is that it is liable for the actions of the police officials on a respondeat superior theory. Since no other basis for the City's liability is alleged, the City is entitled to summary judgment on this claim based on *Monell.*

█ The court now turns to plaintiff's claim that the defendants violated her constitutional right to privacy. The Supreme Court has determined that several provisions of the Constitution provide a right to privacy which prohibits unwarranted government interference in certain matters. *Griswold v. Connecticut*, 381 U.S. 479, 484–86, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965). The court has also recognized that there are two kinds of privacy interests which are protected by the Constitution. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589,

---

**3.** Plaintiff's complaint also alleges that the defendants violated her statutory right to privacy. However, plaintiff fails to specify what privacy statute was violated by the defendants. Therefore, the court will only examine plaintiff's constitutional claim.

599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977).

Where an individual's privacy rights come into conflict with interests of state and local governments, the legitimate rights of the parties must be reconciled in a manner which is consistent with the Constitution. *Briggs v. North Muskegon Police Dept.*, 563 F.Supp. 585, 587 (W.D.Mich. 1983), *aff'd*, 746 F.2d 1475 (6th Cir.1984), *cert. denied*, 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985). A public employee may not be required to relinquish constitutionally-protected rights in order to gain or continue public employment absent some substantial justification by the public employer. *See, e.g., Kelley v. Johnson*, 425 U.S. 238, 245, 96 S.Ct. 1440, 1444–45, 47 L.Ed.2d 708 (1976); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). However, it has also been recognized that state and local governments have greater latitude in restricting the activities of its employees than that of citizens in general. *Kelley v. Johnson*, 425 U.S., at 245, 96 S.Ct. at 1444–45.

In order to resolve the defendants' motions for summary judgment, it is necessary for the court to carefully consider both the interests of the individual and the interests of the government. The court notes that plaintiff's claims might well fall within the recognized privacy interest in "avoiding disclosure of personal matters." Plaintiff alleges that the police officials and the psychologists/psychiatrists disclosed private information regarding the plaintiff to each other. The uncontroverted evidence is that the police officials, in providing background information regarding the plaintiff, gave Drs. Heisler and Radom copies of the investigative records relating to the various complaints made by the plaintiff to the Department. It is not clear what interest, if any, the plaintiff had in preventing disclosure of these investigative reports to persons outside the Department.[4] Assuming that the plaintiff had some privacy interest in these records, that interest would be very limited. The records at issue involved plaintiff's complaints that she was not given the job she was promised by the Department. Also disclosed were her complaints filed with the Department regarding the unauthorized entry into her apartment and her claims that she was being followed. This information is not of a type that falls within the fundamental core of rights protected by the Constitution's guarantees of privacy and free association—i.e., the individual's interest in family living arrangements, procreation and marriage. *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). For these reasons, the court finds that plaintiff's privacy interest, if any, in the records involved is narrow.

Plaintiff's privacy interest in the information disclosed by Drs. Radom, Claiborn and Heisler is also limited. Drs. Radom and Heisler were asked by the Department to evaluate the plaintiff's psychological condition. The undisputed evidence is that neither Dr. Radom nor her supervisor, Dr. Claiborn, rendered any professional opinion or diagnosis of the plaintiff's condition or her ability to function as a police officer. Only two "disclosures" were made by the psychologists. The first involved Dr. Radom's statements to the police officials that plaintiff had been hostile during her initial interview. The second "disclosure" occurred in the letter from Drs. Radom and Claiborn withdrawing from plaintiff's case; in this letter, the psychologists recommended that the plaintiff's evaluation occur in a "multi-disciplinary" facility in order to assuage plaintiff's fear of an unfair evaluation. Since these disclosures do not include any professional opinion or evaluation of the plaintiff, her constitutionally-protected privacy interest, if any, in preventing disclosure of these statements is slight. Clearly, any disclosures made on or after April 22, 1985, are not protected since plaintiff signed a release allowing the Mis-

---

**4.** If the records were open to the public as a matter of Department policy, plaintiff would clearly have no expectation of privacy in the records.

sion Psychology Group to disclose records and information regarding the plaintiff to the Department.

Based on the uncontroverted evidence, the court further finds that the plaintiff had no constitutional right to privacy in regard to statements made by Dr. Heisler to the Department. Plaintiff has not denied that she signed a release allowing Dr. Heisler to disclose plaintiff's records to the Department. This release included "any information including the diagnosis and records of any treatment or examination...." Plaintiff has brought forth no evidence indicating that Dr. Heisler released any information prior to the date on which the plaintiff signed the release, or that Dr. Heisler released any information to any person other than authorized under the release. For these reasons, the plaintiff has absolutely no constitutional right to privacy in regard to Dr. Heisler's records.

On the other hand, the local police officials had a substantial, valid interest in disclosing and obtaining this personal information about the plaintiff. The Department was entitled to use reasonable means to determine the plaintiff's ability and fitness to perform the duties of her position before placing her on the streets as an armed police officer. Furthermore, the record shows that the Department acted reasonably in requiring the plaintiff to undergo additional psychological testing. The uncontroverted evidence is that plaintiff complained that a Lenexa police officer entered her apartment under false pretenses. Plaintiff persisted in this belief even though the police investigations found that a repairman who fit plaintiff's description admitted being the person entering her apartment and that the police officer plaintiff identified had been elsewhere when the event occurred. Later, plaintiff complained that she was being watched and followed by Mayor Eilert and persisted with this claim even after the Department found it to be unsubstantiated. Plaintiff has brought forth no evidence indicating that the Department's investigations of these matters were inadequate or biased.

Furthermore, there is no evidence that the Department or the psychologists that it hired delved into any personal matters regarding the plaintiff which were unrelated to their legitimate interest in determining the plaintiff's psychological fitness for her position. The court wishes to emphasize that this is not a case where the police department attempted to question or discharge the plaintiff because of her private, off-duty activities. *Cf. Thorne v. City of El Segundo,* 726 F.2d 459 (9th Cir.1983), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984) (holding that police applicant's right to privacy was violated when she was required to take a polygraph examination and answer questions regarding her sex life); *Briggs v. North Muskegon Police Dept.,* 563 F.Supp. 585 (W.D.Mich. 1983), *aff'd,* 746 F.2d 1475 (6th Cir.1984), *cert. denied,* 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985) (holding that the discharge of a police officer because he was cohabitating with a woman to whom he was not married was unlawful); *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D.Pa.1979) (holding that regulations permitting inquiry into off-duty relationships of police officers exceeded the scope of the state's legitimate interests and violated the officer's constitutional rights); *but see Shawgo v. Spradlin,* 701 F.2d 470 (5th Cir.), *cert. denied, Whisenhunt v. Spradlin,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983) (officers' right to privacy not infringed by regulation prohibiting cohabitation of two police officers or proscribing superior officer from cohabitating with officer of lower rank).[5] In these cases, the key factor was the state's failure to show that their inquiry into the officers'

---

**5.** Many federal courts are split on the authority of public employers to delve into a public employee's personal life in matters relating to the person's marital or sexual activities. *See Whisenhunt v. Spradlin,* 464 U.S. 965, 965 n. 1, 104 S.Ct. 404, 404–405 n. 1, 78 L.Ed.2d 345 (1983) (J.J. Brennan, Marshall and Blackmun, dissent-

ing). The court finds that it is unnecessary to precisely determine the scope of protection afforded to a public employee in a case where her employer pries into her off-duty personal activities. In this case, the Department's inquiries were limited to matters extremely relevant to plaintiff's ability to perform her job.

private, off-duty conduct affected or could potentially affect their job performance.

The court must weigh the Department's legitimate interest in determining the plaintiff's fitness to serve as a police officer and the plaintiff's narrow interest in preventing disclosure of the personal information. The court finds that overwhelming evidence has been presented which shows that the municipality's interest in insuring that the plaintiff was capable of performing her duties substantially outweighed any privacy interest the plaintiff had in the information in question. Furthermore, the uncontroverted evidence is that the information in question was disclosed only to those persons who needed such information to make their evaluation of the plaintiff's mental condition. For all these reasons, the court finds that the defendants City of Overland Park, Overland Park Police Department, Scafe, Round, Douglass, Heisler, Radom and Claiborn are all entitled to summary judgment on plaintiff's claim that they violated her constitutional right to privacy.

Nor has the plaintiff brought forward any evidence to support her allegation that the alleged invasion of privacy was racially motivated. Plaintiff has failed to present any evidence that the Department disclosed information about the plaintiff but acted differently when non-minority employees were involved. In fact, the evidence shows that several Overland Park police officers have been sent to Drs. Radom and Heisler for testing, including at least one white male officer. Nothing in the records indicate that plaintiff was treated any differently than these officers.

Plaintiff also alleges that these defendants conspired to violate her constitutional right to privacy in contravention of 42 U.S.C. § 1985(3). The Supreme Court has determined that section 1985(3) is a purely remedial provision that creates no substantive rights. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 376, 99 S.Ct. 2345, 2349, 2351, 60 L.Ed.2d 957 (1979). This provision was intended to confer remedies for enforcement of rights arising under the federal constitution or federal law. *Howard v. State Dept. of Highways,* 478 F.2d 581, 585 (10th Cir.1973). Since the uncontroverted evidence has established that plaintiff's constitutional right to privacy was not violated by defendants and that the defendants actions were not based on racial animus, plaintiff's conspiracy allegations under this claim must also fail. For these reasons, defendants City of Overland Park, Overland Park Police Department, Scafe, Round, Douglass, Heisler, Radom and Claiborn are entitled to summary judgment on plaintiff's claim of conspiracy to violate her right to privacy.

**D.** *Plaintiff's Racial Discrimination Claims.*

According to the final pre-trial order and Count II of plaintiff's proposed second amended complaint, plaintiff alleges that the City, Police Chief Scafe, Captain Round, Lieutenant Douglass and Police Academy Director Wolfskill discriminated against her and conspired to discriminate against her because of her race. Plaintiff claims that these defendants conspired to terminate her because she was black. In furtherance of this conspiracy, plaintiff alleges that the defendants did the following: (1) defendant Wolfskill failed to submit plaintiff's name for certification; (2) defendant Wolfskill refused to give her credit for completing situational training as an Assistant United States Marshal when he gave non-minority recruits credit for previous training in other situations; (3) defendant Wolfskill told plaintiff she had not graduated from the training program, even though he signed her graduation certificate; and (4) defendant Wolfskill wrote a letter to Police Chief Scafe dated May 1, 1985, stating that plaintiff could not be certified. Finally, plaintiff alleges that she was terminated by the Department because she was black and because of a practice of the City and Department to discipline police officers who object to the Department's "felony nigger rule."

The court will first address the plaintiff's section 1981 claim that she was terminated from her employment because of her race and because of her "objection" to the "felony nigger rule." It is well-settled that

courts should apply the legal principles enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to actions brought under 42 U.S.C. § 1981. *See, e.g., Meyers v. Ford Motor Co.,* 659 F.2d 91, 93 (8th Cir.1981); *Lee v. Conecuh Co. Bd. of Educ.,* 634 F.2d 959, 962–63 (5th Cir.1981); *Sabol v. Snyder,* 524 F.2d 1009, 1012 (10th Cir.1975). To establish a disparate treatment claim under section 1981, the plaintiff must prove that the employer "treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

In *McDonnell Douglas,* the Supreme Court established a three-part analysis for a claim of employment discrimination. First, the plaintiff must establish a prima facie case of discrimination. In a discharge case, the plaintiff must generally show that: (1) she belongs to a protected class; (2) she was qualified for the job; (3) she was discharged; and (4) after her discharge, the job remained open or she was replaced by a non-minority worker. *See, e.g., Ray v. Safeway Stores, Inc.,* 614 F.2d 729, 730 (10th Cir.1980). A prima facie case may also be established by proof that the plaintiff was terminated while non-minority workers with comparable work records were retained. *Worthy v. United States Steel Corp.,* 616 F.2d 698, 700–01 (3d Cir.1980). Plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Clark v. Atchison, Topeka & Santa Fe Rwy.,* 731 F.2d 698, 701 (10th Cir.1984).

The court is well-aware that summary judgment is to be granted with particular caution in cases, such as discrimination cases, where questions of intent are involved. *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980). However, Rule 56 of the Federal Rules of Civil Procedure does apply to employment discrimination actions. *See, e.g., Clark v. Atchison, Topeka & Santa Fe Rwy.,* 731 F.2d at 703. Based on the uncontroverted facts, the court finds that plaintiff has failed to show that there is any genuine issue of material fact in relation to her claim that her termination was racially motivated.

First, there is absolutely no evidence that plaintiff's termination had *anything* to do with the so-called "felony nigger rule." The evidence indicates that plaintiff was repeatedly informed that such a rule was not the policy of the Department and that she would not be required to enforce it. The evidence also shows that the Department reprimanded officers who use the "felony nigger rule" terminology. Plaintiff has failed to bring forth any evidence to support her allegations that she was terminated because of her "objections" to the "felony nigger rule." Nor has plaintiff brought to the court's attention any evidence tending to show that the City or the Department had a practice of disciplining officers who objected to the "rule" in question. Plaintiff cannot avoid summary judgment by relying solely on the allegations made in her complaint.[6]

The evidence clearly shows that the reason for plaintiff's termination was the Department's lingering concern about her psychological state. Nothing in the record raises any reasonable inference that these concerns were mere pretext to allow unlawful discrimination. It is undisputed that the Department became concerned about the plaintiff's psychological fitness to perform the duties of an armed police officer after plaintiff's complaints about being followed and plaintiff's refusal to accept the results of a police investigation even in the face of seemingly conclusive evidence. It is also undisputed that the Department required the plaintiff to see a private psychol-

---

6. This is not to say that the court condones the use of the term "felony nigger rule." We are greatly distressed that a public official would coin such a term, for whatever purpose, and that the term may still be in use by at least some members of the Department.

ogist and psychiatrist and that plaintiff was uncooperative during the clinical interviews. Finally, in an opinion rendered after plaintiff signed a release, Dr. Heisler stated that although plaintiff was uncooperative, he saw certain symptoms and that he could not rule out the possibility that these symptoms might affect plaintiff's ability to perform as a police officer. Plaintiff has brought forth no evidence, nor can the court glean from the record any evidence that the Department's decision to have plaintiff complete additional psychological testing was racially motivated. In fact, the undisputed facts are that the Department had referred several other police officers to Drs. Radom and Heisler; at least one of these officers was a white male.

Based on all the evidence brought before the court, we find that the Department's concern about plaintiff's mental condition was reasonable in light of all the circumstances. Furthermore, there is no evidence that any non-black officer in similar circumstance was treated any differently. For these reasons, the court finds that the City, the Department and defendants Scafe, Round and Douglass are entitled to summary judgment on plaintiff's claim that her termination was based on her race.

■ It also appears that the plaintiff is alleging independent acts of racial discrimination on the part of defendant Jerry Wolfskill, Director of the Police Training Program. Plaintiff alleges that Wolfskill failed to submit her name for certification and failed to give her credit for her previous training because of her race and in conspiracy with Department officials. It is undisputed that defendant Wolfskill signed plaintiff's graduation certificate indicating that she had completed the training requirements necessary to be certified as a police officer under state law. However, plaintiff admitted in her deposition that she had not completed her "situational training" as required and that defendant Wolfskill had informed her that she had not completed this training. Again, plaintiff has failed to bring to the court's attention any evidence which would raise an infer-

ence that Wolfskill's actions were racially motivated. There is no evidence of any kind that non-minority police recruits were given credit toward the situational training requirement when the plaintiff was denied the same credit. There also is no evidence that non-minority recruits who did not complete the situational training requirement were treated any differently from the plaintiff. Again, plaintiff's claims cannot survive summary judgment by simply relying on the allegations in her complaint.

■ The final claim of racial discrimination relates to plaintiff's allegations of conspiracy on the part of the City, Scafe, Round, Douglass and Wolfskill. To establish a claim of conspiracy under section 1985(3), the plaintiff must plead and prove (1) a conspiracy (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal privileges and immunities under the laws, and (3) an act in furtherance of the conspiracy (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). To state a cause of action under section 1985, the pleadings "must specifically present facts tending to show agreement and concerted action." *Sooner Prod. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir.1983). Defendants are entitled to summary judgment for several reasons. First, the court has already ruled that, as a matter of law, defendants' actions were not racially motivated. Since plaintiff's section 1981 substantive claim of racial discrimination has failed, so must her claim of conspiracy under section 1985. *Thompson v. International Ass'n of Machinists & Aerospace Workers*, 614 F.Supp. 1002, 1010 (D.D.C.1985). In addition, there is no evidence of any conspiracy between Wolfskill and anyone in the Department. The *only* evidence of any contact by Wolfskill with the Department regarding the plaintiff was Wolfskill's letter to Chief Scafe dated May 1, 1985. This letter, by itself, does not raise an inference of conspiracy. For these reasons, all these defendants are entitled to summary judg-

ment on plaintiff's claim of conspiracy to racially discriminate against the plaintiff.

### E. *Plaintiff's Libel and Slander Claims.*

■ Court IV of plaintiff's complaint, as stated in the final pre-trial order, alleges that the defendants Round and Douglass libeled and slandered her and that the City was liable under the theory of respondeat superior.[7] Specifically, plaintiff alleges that these defendants slandered her by implying that she had a psychological problem in their conversations with Drs. Radom and Heisler. She further claims that the defendants libeled her in the letters they gave the plaintiff dated April 12 and April 15, 1985.

After careful review of the file, the court finds that plaintiff has again failed to bring forth sufficient evidence for her claims to withstand defendants' motion for summary judgment. As to the alleged defamatory statements made by the Department officials to Drs. Radom and Heisler, the court finds that the statements are privileged under Kansas law. In discussing the nature of absolute and conditional privileges in a libel case, the Kansas Supreme Court has held:

A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person ... or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do.... The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.

*Faber v. Byrle,* 171 Kan. 38, 42, 229 P.2d 718, 721 (1951) (quoting 33 Am.Jur., *Libel and Slander,* § 126). Whether an allegedly defamatory statement is privileged, either absolutely or qualifiedly, is a question of law to be decided by the court when the evidence is undisputed. *Faber v. Byrle,* 171 Kan. at 43, 229 P.2d at 722.

Based on the undisputed facts in this case, the court must conclude that the defendants' statements were, at a minimum, qualifiedly privileged. Based on the circumstances, the defendants could reasonably believe that plaintiff's present psychological state might impair her ability to function as a police officer. Furthermore, these defendants had a clear interest in determining, through the assistance of professionals, whether plaintiff was psychologically fit for the position for which she was hired. They also had an obligation to the public to ensure the psychological well-being of their officers. Finally, all the evidence shows that the publication was only made to the examining physicians and that the statements were limited in scope. For these reasons, defendants Round, Douglass and the City are entitled to summary judgment on plaintiff's slander claims.

■ Plaintiff's libel claim is directed at letters written by the defendant Round dated April 12 and April 15, 1985. These letters were given to the plaintiff. The first letter stated that as a condition to her continued employment, plaintiff had to undergo additional testing with Drs. Radom and Heisler. The second letter stated that the purpose of the additional testing was to "determine your psychological fitness to assume the duties of a police officer...."

Under Kansas law, the tort of defamation includes both libel and slander. *Luttrell v. United Tel. Sys., Inc.,* 9 Kan. App.2d 620, 620, 683 P.2d 1292, 1293 (1984), *aff'd,* 236 Kan. 710, 695 P.2d 1279 (1985). The elements of the tort of defamation include (1) false and defamatory words, (2)

7. In Count IV of plaintiff's first amended complaint, plaintiff also alleged that Dr. Radom slandered her. However, this claim was not included in the final pre-trial order and the court need not address that claim. It is axiomatic that the pre-trial order supersedes all earlier pleadings. Fed.R.Civ.P. 16(e).

communicated to a third person, (3) which result in harm to the reputation of the person defamed. *Polson v. Davis,* 635 F.Supp. 1130, 1147 (D.Kan.1986) (citing *Luttrell v. United Tel. Sys., Inc.,* 9 Kan. App.2d at 620–21, 683 P.2d at 1293). In the case of the letters from defendant Round, plaintiff has failed to establish that there was any "communication" or "publication" of the contents of the letters to a third person. Plaintiff has not alleged that the defendants gave or showed these letters to any third person. Absent such publication, the plaintiff has no claim for libel. Therefore, defendants' motion for summary judgment is granted.

To summarize, the court has granted plaintiff's motion to amend, in part. Furthermore, the court grants all the defendants' motions for summary judgment on all claims.

### III. *Defendants' Motions for Sanctions.*

Most of the defendants have requested sanctions against the plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure. The court is inclined to grant some sanction against the plaintiff to some or all of the defendants. However, the court is reluctant to impose Rule 11 sanctions absent some response from the plaintiff. Therefore, the defendants' motions for Rule 11 sanctions will be held in abeyance until August 10, 1987. Plaintiff is hereby ordered to file a memorandum by August 10, 1987, to show cause why Rule 11 sanctions should not be imposed on her as to all defendants.

IT IS THEREFORE ORDERED that plaintiff's motion for leave to amend is granted, in part.

IT IS FURTHER ORDERED that all motions for summary judgment filed by the defendants are granted in their entirety.

IT IS FURTHER ORDERED that the defendants' motions for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure are held in abeyance until August 10, 1987.

IT IS FURTHER ORDERED that plaintiff file a memorandum with the court by August 10, 1987, to show cause why Rule

11 sanctions should not be imposed on her as to all defendants.