**Karen SORLUCCO, Plaintiff,**

v.

**NEW YORK CITY POLICE DEPARTMENT, Defendant.**

No. 85 Civ. 6895 (MBM).

United States District Court,
S.D. New York.

Jan. 17, 1989.

Kathleen A. Sullivan (Alice Swenson, Legal Intern), Brooklyn, N.Y., for plaintiff.

Robin M. Levine, Asst. Corp. Counsel (Peter L. Zimroth, Corp. Counsel), New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

In this civil rights action, plaintiff Karen Sorlucco, challenges defendant New York City Police Department's ("NYPD") decision to discharge her as a probationary police officer. Plaintiff asserts that defendant terminated her on the basis of gender in violation of 42 U.S.C. § 1983 (1982) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1982). She further alleges that defendant conspired with the Nassau County Police Department, notably not a defendant here, to deprive her of due process of law in contravention of 42 U.S.C. § 1985(3) (1982). Plaintiff seeks reinstatement and back pay. Plaintiff's amended complaint contained a request for punitive damages, which she has withdrawn. Defendant now moves for summary judgment on all the claims. For the reasons below, summary judgment is granted.

### I.

A detailed discussion of the rather complex facts surrounding plaintiff's termination is necessary to evaluate the claims plaintiff would derive from them. As always, all inferences must be drawn in favor of plaintiff. Plaintiff joined the NYPD on January 26, 1982. She was required to complete an eighteen-month probationary period before becoming a police officer. Her first five months were spent at the Police Academy where she performed well academically, graduating in June 1982 in the top fifteen percent of her class. Largely because of her excellent grades, plaintiff was "red flagged"; that is, she was sent directly to work in a precinct without the usual period of training. She was assigned to the 94th Precinct in Greenpoint, Brooklyn. (Sorlucco dep. at 18–19; Pltf.'s Exh. I) However, plaintiff was still on probationary status, meaning that she was subject to

"continuous" evaluation, NYPD *Administrative Guide*, § 320.4 (Probationary Police Officer—Evaluation), and to separate stringent procedures, not applied to police officers who had passed the probationary period, in the event of misconduct. *Id.* and NYPD *Patrol Guide*, § 118–15.

On January 17, 1983, plaintiff appeared at the Nassau County Police Department, upset and distraught. She claimed that she had been raped at her residence by an unidentified white male some ten days earlier, on January 7, 1983. She explained to Nassau policemen Arthur Swoboda and Robert Bittner that she had been in a laundromat dressed in jogging pants. A man she did not know approached her and asked her whether she jogged. When she said yes, the man asked her if he could run with her. She agreed, but explained that she had to bring her laundry home and have a cup of coffee; she invited him to her apartment. Upon arriving at her house, plaintiff placed her service revolver on her bureau and began making coffee. Suddenly, the male pointed plaintiff's gun at her and began to sexually assault her. During the assault, he fired one shot from her revolver into the bed. (Pltf.'s Exh. H–1)

The detectives visited the scene of the crime. Swoboda recovered the spent bullet. Meanwhile, the Nassau County Police Department notified NYPD of the occurrence. NYPD Captain John Hunt arrived at the Nassau County Police Department late in the evening on January 17. After investigating the matter, he placed plaintiff on "modified" assignment and removed her firearm. (Pltf.'s Exh. H–1 at 3–4) Plaintiff had already been placed on sick report, this change in status stemming from injuries she sustained in a car accident on January 14th. Plaintiff did not suffer any loss of pay or benefits as a result of this assignment. The next morning, January 18, Hunt filed a report on the incident. Captain Carmine LaCava of the Brooklyn North Field Internal Affairs Unit was assigned to monitor plaintiff while she was on modified assignment. Further, plaintiff was referred to NYPD's Psychological Ser-

vices. (Pltf.'s Exh. H–1 at 4) A staff psychologist, Dr. Eloise Archibald, was assigned to counsel plaintiff and met with her on January 19, 1988.

Plaintiff's account changed dramatically on January 21, when plaintiff, accompanied by counsel, appeared at the Nassau County Police Department and recanted her initial rendition of the events. She now stated that the attack had taken place on January 12, not January 7. (Sorlucco dep. at 33, 42–45) Her attacker was not unknown, but was instead police officer John Mielko, who was assigned to the same precinct as plaintiff. Early in the morning of January 13, 1983, plaintiff called him in an agitated state, apparently upset at problems she was having with her boyfriend, Richard Bart. Plaintiff invited her coworker to visit her at home. Once there, he proceeded to sexually assault her for a period lasting six to eight hours. While aiming plaintiff's service revolver at her head, he forced her to perform oral sex and used household objects—a candle and a broken television antenna—to sodomize her. He threatened to kill her if she reported his attack to anyone. Sometime during the attack, he fired a round from plaintiff's revolver into her bed.

In fear for her safety, plaintiff decided not to report the incident immediately. The following day, January 14, 1983, plaintiff asked a friend, Natalie Schultz, to accompany her to the 94th Precinct to pick up her paycheck. Schultz, however, could not leave her home so plaintiff went alone to the 94th precinct later that afternoon. Plaintiff was involved in a traffic accident on that day, although it is not clear from the papers submitted to this court at what time that occurred. When plaintiff arrived at the precinct, her alleged assailant and fellow officer confronted her and repeated his earlier threat to kill her if she reported the assault. He further threatened that, on the upcoming Sunday when they were scheduled to work together, he could once again assault her. If she reported him, he claimed, no one would believe her. (Sorlucco dep. at 96)

Over the next few days, plaintiff visited the Schultz's, her next door neighbors. The couple noticed that plaintiff was very upset but did not know why. During a visit on January 17, plaintiff confessed that she had been sexually assaulted in her apartment. (Sorlucco dep. at 99) Accompanied by Ralph Schultz, a Transit Authority policeman, plaintiff filed the report she now admitted was false. As she later explained to LaCava, she falsified the account so that, although her alleged assailant would not be implicated and thus would not exact revenge on her, he would be on notice that someone was keeping an eye on her and would stay away. (Pltf.'s Exh. H–2 at 5) The date she used, January 7, was her birthday. Before she could complete her report on January 17, however, she grew so upset by what she claimed were the Nassau County police officers' vulgar statements that she left the precinct. The police officers had to go to her apartment to bring her back to finish her report. (Pltf.'s Exh. H–2 at 5)

On February 2, 1983, Nassau County police administered a polygraph test to plaintiff's alleged attacker, who passed. (Pltf.'s Exh. H–2 at 2) They then so tested plaintiff, who failed. (Sorlucco dep. at 111) Plaintiff claims that the test included no questions regarding her attacker. (Sorlucco dep. at 112) Once the test was over, plaintiff asserts, Lt. Eugene Dolan of the Nassau County Police Department told plaintiff that if she did not withdraw her complaint against her co-worker, she would lose her job. Plaintiff then signed a form provided by Dolan withdrawing her complaint. Meanwhile, LaCava was in touch with NYPD's Advocate's Office, which is responsible for determining whether disciplinary charges should be filed, to find out what he should do about plaintiff's charges against the police officer who allegedly raped her. William Frohne, an attorney in that office, told LaCava to seek a release from the Nassau County prosecutor's office before interviewing either the policeman or plaintiff. (LaCava Aff. at ¶ 10; Pltf.'s Exh. H–2 at 2)

The very next day, plaintiff claims, she took and passed a second polygraph test

and sent it to LaCava. It is not clear which polygraph test was sent to LaCava, although at his deposition he recalled receiving one. (LaCava dep. at 88) On February 17, 1983, he obtained permission from Nassau County Assistant District Attorney Pat Guiney to interview plaintiff and her alleged attacker. In order to facilitate questioning, LaCava sought to review Nassau County's files on the case. Despite repeated requests for a copy of these files, however, LaCava did not receive them until May 18. (LaCava Aff. at ¶ 11)

Plaintiff was placed on restricted duty by Dr. Archibald on February 14 and assigned to NYPD's Health Services. An employee is placed on restricted duty when she is medically and psychologically unable to perform full duty. There is no attendant reduction in pay or benefits. (Kaplan Aff. at ¶ 12)

LaCava found out on February 17 that the Nassau County prosecutor's office was considering pressing charges against plaintiff for making false statements. (LaCava Aff. at ¶ 12) On April 11, 1983, LaCava learned that Nassau County prosecutors had decided to charge plaintiff with falsely reporting an incident and obstructing government administration. The next day, LaCava informed NYPD's Advocate's Office of plaintiff's imminent arrest. Lt. McCauley of that office told LaCava that plaintiff should be suspended if she were arrested. (LaCava Aff. at ¶ 13)

The Nassau County prosecutor's office filed criminal charges against plaintiff on May 23. She was arraigned in First District Court, Nassau County, and charged with: falsely reporting an incident, 3rd degree, a Class B misdemeanor; two counts of making a false statement, a Class A misdemeanor; and obstructing governmental administration, a Class A misdemeanor. (LaCava Aff. at ¶ 14) Specifically, she was accused of making false statements regarding the unknown attacker on January 17. When plaintiff appeared at the courthouse, she met LaCava for the first time. LaCava suspended her without pay and confiscated her identification card. NYPD charged plaintiff administratively with conduct un-

becoming an officer, making a false statement, and failure to safeguard her firearm. (Pltf.'s Exh. H–3)

NYPD was then investigating both plaintiff and her alleged assailant. On June 2, 1983, LaCava interviewed plaintiff in the presence of her attorney. (Pltf.'s Exh. H–3 at 4–5) LaCava subsequently visited plaintiff's landlord. (LaCava Aff. at ¶ 15) On June 14, LaCava also spoke with Ralph Schultz who stated that, when plaintiff came over to their apartment on January 17, she appeared so upset that he felt it necessary to take her revolver and safeguard it. (Pltf.'s Exh. H–3 at 6)

By memorandum dated June 21, 1983, Leonard Kaplan, the commanding officer of the NYPD's Employee Management Division, recommended that plaintiff be fired because of her arrest. Specifically, he charged that:

1. Said P.P.O. Sorlucco off duty in civilian clothes at or about 2000 hours January 17, 1983 inside Nassau County 5th Precinct did knowingly file a false report.

2. Said P.P.O. Sorlucco at time, date and location indicated in Specification # 1 did wrongfully and without just cause obstruct and impair an official law investigation by filing false reports.

3. Said P.P.O. Sorlucco at time, date, and location indicated in specification # 1 did knowingly make false statements to Det. Arthur Swabodaa [sic] . . . Nassau County Police Department, concerning an incident that occurred at or about 2330 hours, January 7, 1983.

4. Said P.P.O. Sorlucco at or about 1200 hours, January 18, 1983 . . . did knowingly make false statements to Det. Rita Gottesman . . . Nassau County Police Department, concerning an incident that occurred at or about 2300 hours, January 7, 1983.

5. Said P.P.O. Sorlucco on or about January 13, 1983, inside her residence . . . did fail and neglect to properly safeguard her service revolver . . . in that a round was discharged causing property damage, which was not reported until January 17, 1983.

(Def.'s Exh. E) Plaintiff was notified by letter dated July 14, 1983 that she would be dismissed from her position as a probationary police officer the next day, pursuant to New York City Department of Personnel Rules and Regulations 5.2.7. (Def.'s Exh. F)

Despite the dismissal, LaCava continued his investigation, arranging on August 3 to interview the policeman plaintiff accused of raping her. Because of vacation schedules, however, this meeting did not occur until September 16. (LaCava Aff. at ¶ 17) The interview, a PG 118-9 hearing, was an official interrogation of a member of the service concerning alleged wrongdoing. Plaintiff argues that the investigation was reopened only when the New York City Advisory Task Force on Rape wrote the Police Commissioner on August 25, 1983, complaining of NYPD's "unduly harsh" treatment of plaintiff compared with her alleged attacker. (Pltf.'s Exh. H-4) The Task Force also questioned whether NYPD used the results of lie detector tests from the Nassau County Police Department's investigation in formulating its disciplinary charges against plaintiff, in light of NYPD's policy banning such tests for rape victims. Noting that the charges were limited to the admittedly false report of January 17, and thus did not attack plaintiff's January 21 statements when she claimed a co-worker had raped her, the Task Force asked that plaintiff's charges against the policeman be investigated.

In his interview, the policeman accused of rape said that, on December 24, 1982, plaintiff talked to him about a problem with her boyfriend. On January 12, 1983, he received a call from her while on duty. She invited him to her house. He arrived late that night and stayed the night. The next day, she called and invited him to stop by that evening. He again visited her but "could see that she did not want him there," so he left sometime after 2 a.m. A department tape of phone calls recorded no call on January 13, but did record one for him on January 12. In his conversation with LaCava, he denied sexually abusing plaintiff or threatening her. (Pltf.'s Exh. H-2 at 7)

LaCava also interviewed Richard Bart, a Long Beach police officer, whom plaintiff told colleagues was her boyfriend. Bart said that plaintiff was a friend, but that their relationship was platonic. He had met plaintiff when, several years earlier, she claimed she was the victim of an attempted rape and Bart was assigned to the case. (LaCava Aff. at ¶ 18) No suspect was ever apprehended in that case. Finally, LaCava interviewed plaintiff's physician, Dr. Stanley Renner, on December 19. The doctor claimed, and his records corroborate, that plaintiff was examined in his office on January 17. She told him that she had been raped by a man she had met in a laundromat. Dr. Renner was under the mistaken impression that he had to report the rape to state officials and so informed plaintiff. Although the doctor asked plaintiff to report it, she refused. (Pltf.'s Exh. H-3 at 8-9)

On December 29, 1983, LaCava met with an attorney from the Advocate's Office, Gerard Hooper, and told him the results of his investigation. Hooper decided that, because there was no evidence to substantiate plaintiff's allegations, disciplinary action against the accused policeman was inappropriate. (LaCava Aff. at ¶ 20)

In October 1984, the Nassau County prosecutor added a second count of falsely implicating her colleague on January 21. (Amended Complaint at ¶ 30) Plaintiff was found guilty on August 25, 1986 of making a false statement on January 17, but was acquitted of the same charge as to her January 21 statements. (Amended Complaint at ¶¶ 31-32) She was sentenced to three year's probation. On October 21, 1987, the convictions were overturned by an Appellate Division panel. In a short order, the panel noted that, "[i]n our opinion, the evidence did not establish beyond a reasonable doubt that defendant acted with the requisite intent or knowledge [in making false statements and obstructing governmental administration]." (Pltf.'s Exh. F)

## II.

Defendant moves for summary judgment on all three claims. For ease of

discussion, I shall address the Title VII claim first.

The pertinent section of Title VII provides:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Title VII, as originally enacted in 1964, afforded a remedy for employment discrimination only to employees in the private sector. The Equal Employment Opportunity Act of 1972 amended Title VII, *inter alia,* to expand its coverage to employees of state and local governments as well as to employees of the federal government.

Plaintiff advances two theories under Title VII. Her first claim, essentially a "disparate treatment" claim, is that she was treated differently from a similarly situated male employee, in this case the man who allegedly raped her. A plaintiff in a sex discrimination case can attempt to show that the stated reason for her discharge is a pretext by comparing herself to a similarly situated male. *See, e.g., Abasiekong v. City of Shelby,* 744 F.2d 1055 (4th Cir.1984); *Garner v. St. Louis Sw. Ry. Co.,* 676 F.2d 1223 (8th Cir.1982). Thus, her argument proceeds, the policeman involved was similarly under suspicion of criminal activities; yet, he was allowed to continue working, while she was terminated for her alleged criminal activity.

Plaintiff's second claim is a retaliation argument: namely, that she was fired because she confronted her employer with evidence that a male co-worker had sexually harassed her. The protection afforded by Title VII against retaliation, 42 U.S.C. § 2000e–3(a),[1] is not limited to individuals who have filed formal protests, but may also extend to informal protests against what the plaintiff reasonably perceives to be unlawful conduct under Title VII. *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir.1981) (voicing complaints to employers or using an employer's grievance procedures states a claim under this section); *Sias v. City Demonstration Agency,* 588 F.2d 692, 694–96 (9th Cir.1978) (employee wrote letter to Regional Administrator of HUD complaining about hiring practices and job conditions); *Graham v. Texasgulf,* 662 F.Supp. 1451, 1462 (D.Conn. 1987), *aff'd without opinion,* 842 F.2d 1287 (2d Cir.1988) (employee complaints to supervisors actionable); *Hearn v. R.R. Donnelley & Sons Co.,* 460 F.Supp. 546 (N.D. Ill.1978) (employee fired for leading protests against company's discriminatory policies); *Hearth v. Metropolitan Transit Comm'n,* 436 F.Supp. 685 (D.Minn.1977) (employee suspended for protesting dress and grooming policies). When plaintiff reported that a fellow officer assaulted her, she may be said to have raised a claim of sexual harassment, which is unlawful conduct under Title VII.[2] *Meritor Savings Bank F.S.B. v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

The Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), established a three-step process for the allocation of proof for Title VII "disparate treatment"

---

1. Section 2000e–3(a) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

2. Although *Vinson* was decided three years after the events complained of here, there was sufficient legal precedent such that a reasonable

person in 1983 could believe that sexual harassment was unlawful conduct under Title VII. As early as 1980, the Equal Employment Opportunity Commission had issued guidelines specifying that sexual harassment was unlawful under Title VII. *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2405. Furthermore, several court opinions had explicitly so held. *Katz v. Dole,* 709 F.2d 251, 254–55 (4th Cir.1982); *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981).

cases. The initial burden is on the plaintiff to prove a prima facie case of unlawful discrimination. If that is done, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant meets this burden of production, then the plaintiff, upon whom the ultimate burden of persuasion always rests, must show by a preponderance of the evidence that the proffered reasons were not the defendant's true reasons, but were instead a "pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The order of proof in a retaliation case follows the *McDonnell Douglas* methodology. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980).

In order to establish prima facie that a termination is discriminatory, the plaintiff must prove that she was a member of a protected class, that she was discharged, and that there is evidence of disparate treatment from which the court may infer that discrimination caused the discharge. Such cause can be inferred from documentation of satisfactory performance, *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), or from evidence that the plaintiff was replaced by a person outside the protected class, *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir.1982). The Second Circuit has held that failure to demonstrate replacement is not fatal to a claim. *Dacon*, 759 F.2d at 996.

These principles guide the inquiry here. Plaintiff has shown that she is a female, and thus a member of a protected class, and that she performed her job satisfactorily. Defendant responds that it fired her for a neutral, non-discriminatory reason: namely, that she was arrested by the Nassau County Police Department for making false statements and obstructing governmental administration. Plaintiff argues that this reason is pretextual, claiming that a similarly situated male, her alleged assailant, was not discharged. Plaintiff has also shown that she complained of a co-worker's sexual assault such that NYPD was aware of her report. Thus, in the retaliation argument, her claim is that NYPD's proffered reason for her firing is pretextual because, in reality, NYPD terminated her for reporting that a fellow officer sexually assaulted her. Plaintiff may establish pretext in a number of ways: (1) showing that male employees who are similarly situated to plaintiff were retained while plaintiff was not; (2) providing statistical evidence showing that the employer discriminated against women; or (3) demonstrating that the employer's explanation for the discharge was unreasonable.

Plaintiff asserts several factual disputes which she claims show NYPD's unlawful treatment and preclude summary judgment: (1) its decision to discipline plaintiff by placing her on modified status at a time when she had merely reported a rape; (2) its failure to investigate the events of January 13, in particular her charges that she was raped by another police officer; and (3) its decision to terminate her when she was arrested, although she was later acquitted of all charges.

Plaintiff's first contention, that she was disciplined when she was placed on "modified" assignment, seems plausible at first but is ultimately unpersuasive for two reasons: first, it does not appear from the evidence that plaintiff was disciplined; second, if she was, NYPD had ample reason to do so. Plaintiff points to Hunt's January 18 memorandum which contains a legend at the top of the form, "allegation of serious misconduct." Although this seems to be merely an inadvertent use of a standard form, plaintiff notes that another memo from Hunt to the Chief of Operation contains the statement: "13. Charges and specifications to be prepared." (Pltf.'s Exh. H–1 at 2) This comment, however, appears to be a reference to the form Hunt sent to the First Deputy Commissioner. (Pltf.'s Exh. H–2 at 3–4) Moreover, other department action shows these actions were not disciplinary. For example, NYPD referred plaintiff to a psychologist who saw her on January 19 and continued to see her throughout this period, in order, in the

words of the psychologist, "to evaluate her and to see how she was doing. And I should also add, to provide some support." (Archibald dep. at 33) Plaintiff also relies on Dr. Archibald's belief that modified status was usually "associated with some sort of disciplinary status," (Archibald dep. at 61) but the psychologist is obviously not an authority on NYPD personnel policies and her testimony was at best equivocal; as she quickly added, "[a]lthough in the last couple of years I have been led to understand it doesn't have to be [disciplinary in nature]." In sum, NYPD's actions do not demonstrate that it was punishing plaintiff.

Defendant argues that plaintiff was not disciplined, but was placed on "modified" assignment under a catch-all provision providing such transfers when they would be "in the best interests of the Department." (Def.'s Exh. C) Police disciplinary rules clearly distinguish between certain allegations of misconduct for which modified assignment may be ordered as a disciplinary measure, and situations where modified status may be desirable even though there is no apparent misconduct and thus no need for disciplinary action. Moreover, the rules clearly limit the use of modified assignment as a disciplinary measure to the following misconduct: 1) indictment by a grand jury; 2) arrest; 3) issuance of charges and specifications alleging the wrongful solicitation and/or receipt of monies or other gratuities; and 4) inability to carry out duties because of the effects of an intoxicant or drug. Plaintiff's situation fits none of the above categories. Thus, the only logical provision under which plaintiff could have been placed on modified status was the non-disciplinary one.

An even more compelling response to plaintiff's assertions, however, is that, if there was any disciplinary component here, NYPD had a solid basis for it: plaintiff's failure to safeguard her weapon. One of the critical lessons for police officers is the absolute necessity to safeguard a service revolver at all times, whether at home or on the job. *See* NYPD *Patrol Guide* § 105.1 (Uniforms and Equipment General Regulations) at 2 ("Safeguard weapons at all times"); *Cf.* New York State Department of Correctional Services, *Policy and Procedure Manual,* Classif. # 2020 (Off–Duty Firearms Regulation) at 3 (1985) ("In order to assure that weapons possessed by employees do not fall into criminal hands, employees must exercise utmost care to safeguard firearms.... The off-duty discharge of any weapons ... must be reported in writing to the Superintendent ... as soon as possible."); *see also Hacker v. City of New York,* 26 A.D.2d 400, 275 N.Y.S.2d 146 (1st Dep't 1966) (personal injury lawsuit concerning accidental firing of off-duty probationary policeman's revolver in which policeman involved was disciplined and discharged by Department for failing to safeguard his weapon), *aff'd,* 20 N.Y.2d 722, 229 N.E.2d 613, 283 N.Y.S.2d 46 (1967), *cert. denied,* 390 U.S. 1036, 88 S.Ct. 1436, 20 L.Ed.2d 296 (1968). Plaintiff's own account of her rape contains clear evidence that she failed to safeguard her weapon: namely, her admission that she left her gun exposed on her bureau when she invited a stranger into her home. In view of her statements, NYPD had a sound reason for disciplining her—to punish and prevent recurrence of an incident in which plaintiff had her gun used against her.

Concern for plaintiff's failure to safeguard her weapon is evident in almost all the NYPD reports on plaintiff. Indeed, Ralph Schultz, her neighbor and himself a Transit Authority policeman, said he confiscated plaintiff's gun on the night he first accompanied her to the police station for fear she was unable to safeguard it. (Pltf.'s Exh. H–2 at 6) It is not surprising, then, that this charge surfaces in the final departmental charges levied against her in July. Thus, even if NYPD's actions against plaintiff were disciplinary in nature, which is at best extremely doubtful, NYPD had a legitimate concern in disciplining plaintiff for failing to safeguard her weapon.

Plaintiff fares no better in her contention that NYPD failed to investigate her charges against the police officer until September 16, following receipt of the Task Force letter and a full two months after plaintiff was terminated. LaCava had in-

terviewed plaintiff's neighbor and Bart, her boyfriend, and thus had completed the bulk of his investigation before the Task Force letter.

However, it was unnecessary to interview the policeman accused of rape because plaintiff had withdrawn her charges against him in early February. NYPD had no reason to doubt the propriety of this withdrawal. Indeed, LaCava's contemporaneous notes of his interview with plaintiff on June 2, at which she first claimed that the withdrawal was made under duress, show that the withdrawal was tactical: plaintiff and her attorney were planning to reinstate the complaint against the policeman *after* her criminal trial was concluded, (Pltf.'s Exh. H–2 at 5) but had not done so by the summer of 1983, at which time the trial was still three years off. Moreover, plaintiff's arrest for making false statements certainly cast doubt on the truthfulness of her allegations against her fellow officer. Accordingly, NYPD had every reason to delay that aspect of the investigation. Thus, even if NYPD reopened the inquiry only because of the Task Force letter, that cannot be read as evidence of discriminatory animus.

Similarly, the fact that NYPD documents failed to name the accused police officer, while naming plaintiff, does not show discriminatory animus, but rather shows that, because plaintiff had withdrawn her complaint against him, the investigation properly concerned only plaintiff. It also demonstrates a reasonable concern that an individual as to whom a complaint had been withdrawn not have his career forever tarnished.

Plaintiff, however, contends further that NYPD conspired with the Nassau County Police Department to threaten plaintiff with loss of her job if she failed to recant her allegations against a fellow police officer. Her evidence is that Hunt was present at the Nassau County police precinct when she made her report on January 17 and LaCava was present on January 21 and was in touch with Dolan by telephone on the day of her lie detector test. His report for the day, for example, notes that

Dolan "felt Sorlucco would resign from the department and he suggested to her to talk to Capt. Sheridan about her possible resignation." (Pltf.'s Exh. H–2 at 2) Plaintiff thus asks this court to make three leaps of logic. First, she asks me to conclude that Dolan actually threatened plaintiff with loss of her job. Second, she alleges that LaCava's contact with Dolan demonstrates he conspired with Dolan. Finally, she would add LaCava's contact with Dolan the day of her polygraph test to Dolan's alleged threats against her in order to support the conclusion that NYPD itself threatened to retaliate against her.

In order to demonstrate a material issue of fact in dispute in this lawsuit, plaintiff must show something more than conclusory allegations of a conspiracy between the two police departments. LaCava's mere contact with the Nassau County Police Department, without more, is simply not sufficient to show any connection between NYPD and Dolan's alleged threat. To the contrary, not one document or affidavit submitted on this motion contains even the slightest hint of impropriety. Rather, they clearly demonstrate that the Nassau police administered the lie detector test to plaintiff and in general dealt directly with her; LaCava's role was merely as a conduit through which NYPD was kept informed about allegations involving its employees. (Pltf.'s Exh. H–2 at 2, 3; Exh. H–3 at 2, 4) His contact with the Nassau County authorities and his presence when plaintiff made statements on January 21 is evidence of nothing more remarkable than that LaCava was responsible for investigating the case. In the face of such evidence, plaintiff's charge of conspiracy is not sufficient to survive summary judgment. *Redmond v. City of Overland Park,* 672 F.Supp. 473, 487 (D.Kan.1987) (summary judgment granted dismissing conspiracy claim where only evidence of conspiracy was communication between police academy and police department regarding plaintiff). *See also First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968) (plaintiff cannot defeat properly supported summary judgment motion of defendant charged with conspiracy

without offering any significant probative evidence tending to support the complaint); *Coverdell v. Dep't of Social & Health Servs.*, 834 F.2d 758, 769 (9th Cir.1987); *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir.1981) (no trial warranted where "defendants produced affidavits setting forth reasonable grounds for their actions and, in addition, attested that they acted in good faith" and plaintiff responded "by reiterating its conclusory allegations of conspiracy"); *Miller v. Western Bd. of Adjusters, Inc.*, 427 F.2d 175 (9th Cir.1970); *Bittner v. Smith*, 697 F.Supp. 144, 156 (S.D.N.Y.1988) ("If plaintiff has admissible evidence of joint action or a conspiracy, he cannot save it for trial. It must be offered in support of his opposition to a motion for summary judgment.")

Finally, plaintiff argues that, because the criminal proceedings against her have been terminated, defendant may not assert her arrest on the underlying charges as a legitimate reason for firing her. This argument defies logic. The inquiry into whether an asserted reason is pretextual turns on the employer's state of mind at the time of the discharge. *Cf. Abbey's Transp. Serv. v. NLRB*, 837 F.2d 575, 582 (2d Cir. 1988) (focus of inquiry into unlawful discharge in labor context is on employer's motivation when discharge occurred). Later changes in circumstance which may negate the reason do not bear on the employer's earlier state of mind. Here, NYPD decided to fire plaintiff because she was arrested for making false statements. That charge cast serious doubt on plaintiff's veracity, a crucial quality for a policeman. The decision carried with it a significant measure of reasonableness and legitimacy. *See, e.g., Garner*, 676 F.2d at 1227–28 (finding termination for arrest legitimate). The fact that three years later an appellate court overturned her conviction for insufficient evidence of intent to make false statements, as the relevant criminal statute apparently required, does not alter the legitimacy of this action at the time it was taken. Here, plaintiff's probationary status is particularly relevant. See p. 1093, *supra*. Plaintiff's conduct was being scrutinized carefully during the probationary period in aid of a decision by NYPD on whether or not to hire her as a full fledged law enforcement officer. Plaintiff gave NYPD ample reason to conclude that it did not wish to give plaintiff that responsibility.

Plaintiff cites only one case, *Lacey v. Coughlin*, 97 A.D.2d 824, 468 N.Y.S.2d 706 (2d Dep't 1983), that even remotely supports her argument that the dismissal was unreasonable. In *Lacey*, petitioner, a corrections officer, was terminated after he was the subject of criminal charges. Prior to his termination, he was promised that the agency would reinstate him if the criminal charges were later resolved in his favor. Two weeks after his termination, the charges were dismissed and petitioner sought reinstatement. The agency refused to reinstate him. The court ordered that the state provide petitioner with a hearing to decide whether he should be reinstated. *Lacey*, however, is inapposite to the inquiry at hand for a number of reasons: not only did the employer there promise reinstatement, but all charges against petitioner were quickly dropped. Here, no such promise was made and the charges were not dropped; rather, the Appellate Division determined that plaintiff's intent to make false statements was not sufficiently demonstrated. Indeed, the Appellate Division never reached the issue of the veracity of plaintiff's first statements. Additionally, the court merely ordered a hearing on the issue of the termination; there was no finding that the termination was unreasonable. *Lacey* provides no support for plaintiff's position.

Nor does the Task Force letter aid plaintiff in demonstrating disparate treatment. The bulk of the Task Force's concern centered on the fact that plaintiff had been asked to take a lie detector test, contrary to Department rules against administering such tests to rape victims, and that the charges against her co-worker had not been pursued. Although the letter questioned whether the Department's treatment of plaintiff might be "unduly harsh," this comment was based on the Task Force's "understand[ing]" that "police officers who

have misdemeanor charges pending against them may be kept on modified leave." (Pltf's Exh. H–4) Plaintiff does not challenge defendant's position that probationary employees charged with criminal conduct are usually dismissed by showing, for example, that statistics demonstrate to the contrary. Accordingly, the Task Force's comment is irrelevant to any factual dispute here.

Thus, plaintiff cannot show that the decision lacked reasonableness. Moreover, plaintiff has not shown that similarly situated males were not so treated. Plaintiff's argument that NYPD's different treatment of her and her alleged attacker demonstrates disparate treatment is fatally undermined by the fact that he was never arrested and was not a probationary employee and thus is not similarly situated. Additionally, the charges against him were recanted by plaintiff. Accordingly, the two individuals were in completely different circumstances at the time and thus cannot be compared. Finally, plaintiff could show disparate treatment through use of statistical evidence that defendant retained male probationary officers who had been arrested while discharging similarly situated female officers. *See, e.g., Mazzella v. RCA Global Communications*, 642 F.Supp. 1531, 1546 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987). Plaintiff, however, has made no such showing here.

Although summary judgment in discrimination cases is disfavored because questions of intent frequently abound, *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535, 540 (2d Cir.1987), courts consider it inappropriate "only where solid circumstantial evidence exists to prove plaintiff's case." *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir.1987). This is because plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256,

106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). *See also Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). Otherwise, "the salutary purpose of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Plaintiff here has failed to present even a scintilla of circumstantial evidence that NYPD acted discriminatorily in firing her.

To the contrary, the evidence available demonstrates that, after her first report of rape, NYPD acted with compassion, providing psychological assistance to her, despite the fact that her conduct in failing to safeguard her weapon seriously called into question her competency and seemed to require disciplinary measures. Only after NYPD discovered that criminal charges were being levied against her were disciplinary actions taken. NYPD waited until after her arrest before formally discharging her. Finally, any delay by the NYPD in following up on plaintiff's allegations against the policeman was inconsequential, in that plaintiff had withdrawn her complaint against him and plaintiff's arrest for making false statements certainly challenged the truthfulness of her allegations. Because plaintiff has not adduced any circumstantial evidence of discriminatory animus, summary judgment is appropriate.

### III.

■ Inasmuch as plaintiff's Title VII substantive claim of sexual discrimination has failed, so must her claim of discrimination under § 1983,[3] as the allegations are identical and the proof required is the same for both claims. *See Guillory v. St. Landry Parish Police Jury*, 802 F.2d 822, 824 (5th Cir.1986), *cert. denied*, 482 U.S. 916,

---

**3.** Section 1 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.…"

 

107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *Holmes v. Bevilacqua,* 794 F.2d 142 (4th Cir.1986) (en banc); *Molthan v. Temple Univ.,* 778 F.2d 955, 961 (3d Cir.1985); *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980). In her brief, plaintiff requests that, if the court required that plaintiff show an unconstitutional custom or practice of discrimination in order to demonstrate § 1983 municipal liability under *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), further discovery would be necessary on whether other female police officers were discharged in similar circumstances. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 13 n. 2. As I find plaintiff has failed to demonstrate material issues of fact concerning her underlying claim of discrimination, there is no reason to reach the issue of municipal liability under § 1983. Accordingly, the evidence plaintiff desires to discover is irrelevant to the determination here. *Cf. Hancock v. Montgomery Ward Long Term Disability Trust,* 787 F.2d 1302, 1306–07 (9th Cir. 1986) (district court did not abuse its discretion in denying plaintiff's request for additional discovery and granting summary judgment where discovery sought could not lead to relevant information).

## IV.

Plaintiff's claim under § 1985[4] also must be dismissed. Because § 1985(3) cannot be used to redress violations of Title VII, *Great American Fed. S & L Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), I assume that plaintiff's complaint under the statute refers to the conspiracy to force her to withdraw her complaint against her co-worker. Plaintiff has not provided this court with any precedent where such a conspiracy was held to state a claim under the statute, but, for the purposes of this motion, I am assuming,

without deciding, that such a claim would withstand scrutiny. Nevertheless, the reasons stated above demonstrating the inadequacy of plaintiff's showing of a conspiracy apply with equal force to this claim.

In sum, defendant's motion for summary judgment on all of plaintiff's claims is granted. The complaint is dismissed.

SO ORDERED:

---

**4.** The relevant provision of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), provides: "if two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law.... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against one or more of the conspirators."