**Colin LESLIE, Plaintiff,**

v.

**BANCTEC SERVICE CORP., Defendant.**

**No. 95 Civ. 9382 (DAB).**

United States District Court, S.D. New York.

June 10, 1996.

Gareth W. Stewart, New York City (Gareth W. Stewart, of counsel), for Plaintiff.

McFall Law Firm, Dallas, Texas (John E. McFall, of counsel), Jackson, Lewis, Schnitzler & Krupman, New York City (Elise M. Bloom, Jennifer B. Courtian, of counsel), for Defendant.

## MEMORANDUM & ORDER

BATTS, District Judge.

Plaintiff brings this cause of action against the Defendant for employment discrimination pursuant to the New York State Human Rights Law, Executive Law §§ 290 et seq. Defendant removed the action to federal court. Plaintiff now moves to remand and Defendant moves for summary judgment.

## I. BACKGROUND

### A. Factual Background

Plaintiff was employed by Defendant as a Senior Customer Engineer ("SCE"). (Def.'s 3(g) Statement ¶ 1; Pl.'s Dep. at 54.) On January 1, 1992, Defendant implemented a Drug and Alcohol Abuse Policy ("Drug Policy") to maintain a program for an environment free from the influence of illegal drugs, controlled substances and alcohol abuse. (Def.'s 3(g) Statement ¶¶ 2–3; MacFarlane Aff. Attachment B.) The Drug Policy applied to all applicants for employment, current employees, and employees of contractors and subcontractors, and copies of the Drug Policy were given to all such individuals. (Def.'s 3(g) Statement ¶¶ 4–5.) Plaintiff read the Drug Policy and understood it. (Def.'s 3(g) Statement ¶ 6; Pl.'s Dep. at 12–13.) The Drug Policy provided that all employees were subject to unannounced preventive testing by an independent contractor, ASB Meditest ("ASB"), and that any employee with a positive drug test result was subject to immediate suspension leading to termination. (Def.'s 3(g) Statement ¶¶ 7–8, 11.)[1]

In May 1994, twenty-six of the Defendant's employees in the United States were randomly selected for unannounced preventive drug screening.[2] (Def.'s 3(g) Statement ¶ 20.) Plaintiff was one of the employees randomly selected. (Def.'s 3(g) Statement ¶ 26.) Twenty-two of the employees selected were Caucasian, one was African–American, one was Hispanic and two were Asian. (Def.'s 3(g) Statement ¶ 27.) Plaintiff was given a drug screening packet and directed to be tested at the ASB center; once there he completed the necessary paperwork and provided ASB personnel with his specimen.[3] (Def.'s 3(g) Statement ¶¶ 29–33; Pl.'s Dep. at 9–20.) The first test was positive for marijuana. (Def.'s 3(g) Statement ¶ 37; MacFarlane Aff. Attachment F.) The second test confirmed the first one. (Def.'s 3(g) Statement ¶¶ 38–39; MacFarlane Aff. Attachment F.) As a result, Plaintiff's manager informed him he was suspended and subsequently Plaintiff was terminated on May 23, 1994. (Def.'s 3(g) Statement ¶¶ 41–42.)

At SmithKline the specimen is first subject to an initial Enzyme Immunoassay technique screening test. (Def.'s 3(g) Statement ¶ 18; Mills Aff. ¶ 7.) If the specimen tests positive then it is subject to a second confirmatory gas chromatography/mass spectrometry test. (Def.'s 3(g) Statement ¶ 18; Smith Aff. ¶ 8.)

---

[1]. The tests are conducted only upon consent. (Def.'s 3(g) Statement ¶ 9.) The individual submitting to the test may do so in private. (Def.'s 3(g) Statement ¶ 12.) The specimen is given to ASB personnel who check its color and temperature. (Def.'s 3(g) Statement ¶ 13.) The specimen is sealed, labelled and the individual signs a chain of custody form. (Def.'s 3(g) Statement ¶ 13.) The specimen is then sent to SmithKline Beecham Clinical laboratory. (Def.'s 3(g) Statement ¶ 14.) SmithKline is an independent clinical laboratory certified by the United States Department of Health and Human Services, Substances Abuse and Mental Health Services Administration. (Mills Aff. ¶ 3.) BancTec was not involved in the testing. (Id. ¶ 11.) SmithKline was not aware of the donor's race. (Id. ¶ 12.)

[2]. Cindy MacFarlane, Manager of Human Resources in Dallas, Texas, generated the random list of employees. (Def.'s 3(g) Statement ¶ 20; MacFarlane Aff. ¶¶ 2, 18.) The list was created using a FoxPro 20 computer program. (Def.'s 3(g) Statement ¶ 21; MacFarlane Aff. ¶ 19.)

[3]. Plaintiff took advantage of the part of the policy which allowed the donor to provide his sample in private. (Pl.'s Dep. at 14–15.)

None of the other twenty-five samples were positive. (Def.'s 3(g) Statement ¶ 43.) Since the Drug Policy was adopted, nine individuals have been discharged for violation of the Drug Policy and six of those as a result of a positive drug test. (Def.'s 3(g) Statement ¶ 47.) Of the six terminations four were Caucasian and two were African-American. (Def.'s 3(g) Statement ¶ 48.)

Plaintiff failed to respond to the Defendant's 3(g) Statement. Local Rule 3(g) states, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." The Court's individual Rules also set forth detailed instructions for 3(g) Statements and Plaintiff was specifically directed to the Rules in a letter from Chambers dated January 10, 1996. Plaintiff has failed to comply with these rules. Therefore, pursuant to Local Rule 3(g) all Defendant's material facts not in dispute are deemed admitted.

## B. Procedural Background

This Court has had a rather involved history with these parties, not reflected by the 1995 filing date of the present federal action.

Plaintiff first filed its Complaint in the Supreme Court for the County of New York on August 1, 1994. In that Complaint Plaintiff alleged state causes of action as well as an action pursuant to 42 U.S.C. § 1981. Defendant timely[4] filed a notice of removal, based on federal question jurisdiction, and the action was assigned to this Court. No. 94 Civ. 6498 (DAB). On September 13, 1994, Plaintiff filed an Amended Complaint, no longer claiming relief pursuant to 42 U.S.C. § 1981. On October 5, 1994, Defendant filed

an Amended Notice of Removal, based on diversity jurisdiction, and served an Amended Answer. Plaintiff took no action regarding these notices of removal. On February 3, 1995, the Court met with the parties and issued a Scheduling Order. The parties proceeded in discovery and on August 24, 1995, a motion to remand was filed. On September 6, 1995, the Court endorsed a stipulation between the parties, which was agreed to by telephone conference with Chambers and subsequently put into writing. The Stipulation stated that Plaintiff was not proceeding against the Defendant pursuant to 42 U.S.C. § 1981 or any other federal claim, and that his damages would not exceed $50,000.00.[5] The case was then remanded to state court.

On November 3, 1995, after Defendant believed Plaintiff did not agree to limit his damages to $50,000.00, it filed a third Notice of Removal. Before the Court can rule on the Defendant's Motion for Summary Judgment, Defendant must show that the Court has subject matter jurisdiction over the Complaint. The Court will turn its attention first to the Removal Notice and subject matter jurisdiction.

## II. DISCUSSION

### A. Motion to Remand

#### 1. *Notice of Removal; timeliness*

Plaintiff argues that the Defendant's Removal Notice was untimely filed because it was filed more than one year after the filing of the Complaint, and hence barred by 28 U.S.C. § 1446(b), which states "a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action." Plaintiff argues that the third notice of removal filed in November of 1995, occurred more than one year after the commencement of this action in August 1994.

---

4. Defendant was served on August 12, 1994, and filed its notice of removal on September 8, 1994. (Def.'s Mem.Law at 2.)

5. The Plaintiff raises several issues regarding the language of the Stipulation. The Stipulation was signed by the Defendant then forwarded to the

Plaintiff who changed language in the Stipulation. However, because the parties had previously agreed by telephone, the Court changed the language back to the agreed-upon language. In any case, what each party believed the Stipulation to mean is not an issue here.

■ On its face Plaintiff argument is correct, however, the facts presented here are unusual. The Court finds the statute was meant to apply to those litigants, who for the first time, file a notice of removal after one year. Here, Defendant filed three notices of removal. Only upon agreement, that the damages would not exceed the jurisdictional amount, did the Defendant agree to remand. Hence, it would be unfair to penalize the Defendant, who timely filed three removal notices[6] by denying its statutory right to removal based on untimeliness. Defendant would never have had to file its third notice, outside the one-year scope of 28 U.S.C. § 1446, had it not been for the Plaintiff's tactics.

The Court finds the Defendant's notice of removal was timely filed.

### 2. Subject Matter Jurisdiction

■ However, although the Court finds that the removal notice was timely filed, the Defendant still has the burden of showing the grounds upon which removal is based and which confer subject matter jurisdiction. Defendant alleges that this Court has jurisdiction based on diversity.[7] Plaintiff is a citizen of New York. Defendant is incorporated in Delaware and maintains its principal place of business in Texas. Diversity of citizenship clearly exists, however, the issue in this case is whether the jurisdictional amount of $50,000.00 is met.

■ The party seeking to assert federal jurisdiction has the burden of proving that diversity exists. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 183, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936); *United Food & Commercial Workers Union, Local 919 v. CenterMark Properties Meriden Square,*

*Inc.,* 30 F.3d 298, 301 (2d Cir.1994); *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 273 (2d Cir.1994); *Chappelle v. Beacon Communications Corp.,* 863 F.Supp. 179, 181 (S.D.N.Y.1994); *Mopaz Diamonds, Inc. v. Institute of London Underwriters,* 822 F.Supp. 1053, 1055 (S.D.N.Y.1993). Removal statutes are to be "strictly construed against removal and all doubts should be resolved in favor of remand." *Boyer v. Snap–On Tools Corp.,* 913 F.2d 108 (3d Cir.1990) (quoting *Steel Valley Auth. v. Union Switch and Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987), *cert. denied,* 484 U.S. 1021, 108 S.Ct. 739, 98 L.Ed.2d 756 (1988)), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991); *Irving Trust Co. v. Century Export & Import, S.A.,* 464 F.Supp. 1232, 1236 (S.D.N.Y. 1979); *see Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the (removal) statute has defined.").

■ The Supreme Court set the standard used to review the complaint to determine whether subject matter jurisdiction exists:

The rule governing dismissal for want of jurisdiction is that … the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really less than the jurisdictional amount to justify dismissal. *Saint Paul Mercury Indem. Co. v. Red Cab. Co.,* 303 U.S. 283, 288–89 [58 S.Ct. 586, 590, 82 L.Ed. 845] (1938).

Plaintiff offered to settle for between $70,000.00 and $80,000.00. Defendants interpreted these letters as an assertion that Plaintiff sought more than the jurisdictional amount of $50,000.00 and timely removed based on these letters.

---

**6.** All three notices were filed within the thirty day deadline. The first notice was filed on September 8, 1994, less than thirty days after the Complaint was filed on August 12, 1994. The second notice was filed on October 5, 1994, less than thirty days after the Amended Complaint was filed on September 13, 1994. The third notice was filed on November 3, 1995. Recall that the Stipulation remanding the action was dated September 6, 1995. On October 12, 1995, Plaintiff counsel indicated to the Defendant by letter that the Stipulation did not limit what his client could recover. On October 17, 1995, the

**7.** Section 1332 of Title 28 states, "[t]he district courts shall have original jurisdiction of all civil matters where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—(1) citizens of different states...." 28 U.S.C. § 1332.

See *A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991); *Williams v. NYS Livery Serv., Inc.,* No. 95 Civ. 0401, 1995 WL 491485, at *2 (S.D.N.Y. Aug. 17, 1995); *Pirenne Python Schifferli Peter & Associes v. Wyndham Partners, L.P.,* No. 92 Civ. 9252, 1995 WL 261512, at *1 (S.D.N.Y. May 3, 1995). Hence, the Court must find with a legal certainty [8] that the claim is less than the jurisdictional amount. *See, e.g., Deutsch v. Hewes St. Realty Corp.,* 359 F.2d 96, 98 (2d Cir.1966). A defendant must show a "reasonable probability" that the claim is for more than the jurisdictional amount. *Tongkook Am., Inc. v. Shipton Sportswear Co.,* 14 F.3d 781, 784 (2d Cir.1994); *Foschi v. United States Swimming, Inc.,* 916 F.Supp. 232, 241 (E.D.N.Y.1996).

The amount in controversy should be determined from the face of the complaint unless the defendant can show that the amount was determined in bad faith. *Saint Paul,* 303 U.S. at 292, 58 S.Ct. at 591–92; *Pirenne,* 1995 WL 261512, at *1 (quoting *Horton v. Liberty Mut. Ins. Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961)). However, if the complaint does not allege an amount of recovery then the Court is to look to the removal notice. If the removal notice [9] fails to allege facts sufficient to establish the jurisdictional amount then the court may find that it lacks jurisdiction. *Lupo,* 28 F.3d at 273–74; *Pirenne,* 1995 WL 261512, at *1. Furthermore, the amount will be determined at the time of removal. *Rosenberg v. GWV Travel, Inc.,* 480 F.Supp. 95, 96 (S.D.N.Y.1979).[10]

Determining the value of the Complaint can be extremely difficult because the Court must decide what rights are involved and from whose viewpoint [11] they should be measured. Furthermore, when the Complaint is silent as to a monetary value this only serves to increase the difficulty of valuation. The following standards are used to assist the Court in this evaluation.

In actions seeking declaratory judgment it is well established that the value of the judgment is measured by the value of the object of the litigation. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 2443–44, 53 L.Ed.2d 383 (1977); *Law Audit Servs., Inc. v. Studebaker Tech., Inc.,* No. 96 Civ. 0926, 1996 WL 137492, at *3 (S.D.N.Y. Mar. 27, 1996). This doctrine applies to other types of equally intangible items. Punitive damages can be included in the jurisdictional amount, if they are legally recoverable. *A.F.A. Tours,* 937 F.2d at 87; *Rosenberg,* 480 F.Supp. at 97. Finally, fees are not added to the amount. *Givens v. W.T. Grant Co.,* 457 F.2d 612, *on remand on other grounds,* 472 F.2d 1039 (2d Cir.1972).

Here, Plaintiff in his Amended Complaint requests no monetary value. However, the Amended Complaint does request that the Court:

A. Declare[ ] that he has suffered discrimination at the hands of defendant and enjoin defendant from continuing its discrimination against plaintiff;

---

8. The "legal certainty" test makes it difficult to achieve dismissal. There are three instances in which the standard is clearly met: 1) when the terms of a contract limit the plaintiff's recovery; 2) when a statute or other law limits the recovery; or 3) when independent facts show the jurisdiction amount was pled in order to avoid federal jurisdiction. *Pirenne,* 1995 WL 261512, at *1 (quoting 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3702 at 48–50 (2d ed. 1985)).

9. Here, the Removal Notice sets forth the fact that the Plaintiff is seeking between $70,000.00 and $80,000.00 to settle the claim. Furthermore, they assert that Plaintiff will not agree that the damages will not exceed $50,000.00. Hence, the Defendant asserts the claim is for more than $50,000.00.

10. It is well settled that the actions of the Plaintiff after removal is perfected cannot divest the Court of jurisdiction. *Saint Paul,* 303 U.S. at 294–95, 58 S.Ct. at 592–93. However, the Plaintiff may decide to sue for less than the jurisdictional amount, "and though he would be justly entitled to more, the defendant cannot remove." *Id.* at 294, 85 S.Ct. at 593. Here, if Plaintiff had sought no more than $50,000.00 he could have remained in state court. However, the Plaintiff has refused to be bound by that amount.

11. When necessary, the Court will use the "plaintiff's viewpoint" test. *See Law Audit Servs., Inc. v. Studebaker Tech., Inc.,* No. 96 Civ. 0926, 1996 WL 137492, at *3 (S.D.N.Y. Mar. 27, 1996).

B. Order that plaintiff be reinstated with defendant;

C. Order that plaintiff be awarded the back pay he would have earned had defendant not discriminated against him;

D. Order that plaintiff be awarded compensatory damages for pain, suffering and emotional distress, and punitive damages;

E. Award plaintiff the costs and disbursements of this action, including a reasonable attorney's fees.

▮▮▮ First, there are two items the Court cannot consider. Part E cannot be included in the jurisdictional amount. Part D with regard to punitive damages is not included because punitive damages are not recoverable under the NYS Human Rts.Law, Exec.Law § 296. *Thoreson v. Penthouse Int'l, Ltd.,* 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 981–82, 606 N.E.2d 1369, 1372–73 (1992).

▮▮▮ Next, the Court must determine the date from which it will measure the damages. The Court will measure the damages at the time of the third Notice of Removal, which is the Notice at issue here. Plaintiff was terminated on May 23, 1994. The Notice of Removal was filed on November 3, 1995. Plaintiff received $29,600 a year as salary. (Pl.'s Dep. at 54.) Hence, as of November 3, 1995, Plaintiff's back pay amounted to approximately $46,168.00. A jury who believed Plaintiff could also award him thousands of dollars in compensatory damages. In addition, if Plaintiff were reinstated, that would be worth the amount of years he would work at the Defendant, also resulting in thousands of dollars. Furthermore, the worth of ceasing discrimination or compensating for discrimination, a usually humiliating experience, can also result in thousands of dollars. Finally, Plaintiff's recent requests to settle for more than $50,000, an indication of what he believes his claim is worth, all lead the Court to find that Defendant advanced a reasonable probability that the claim is over $50,000 and the Court concludes that it cannot dismiss the case from federal court as it cannot determine with a

legal certainty that the claim is for less than $50,000.[12]

**B. Motion for Summary Judgment**

**1. *Standards***

▮▮▮ The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir. 1988). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

▮▮▮ As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO,* 933 F.2d 187, 191 (2d Cir.1991); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

**2. *Plaintiff's Complaint***

Plaintiff brought suit pursuant to New York State Human Rights Law, Executive Law §§ 290 *et seq.* In it he alleges the

---

**12.** This conclusion holds true even if the Court were to measure damages from the Second Notice of Removal on October 5, 1994. At that time Plaintiff's back pay was approximately $12,-

350.00. However, for the reasons stated above Plaintiff, if believed, could recover considerably more.

following claims: (a) Defendant terminated Plaintiff based on a manufactured positive drug test which was a pretext for racial discrimination and refused to retest him (Compl. ¶¶ 5–7, 9–10, 14–17); (b) Defendant unlawfully harassed Plaintiff to force him to exchange work shifts with a Caucasian employee (*Id.* ¶¶ 3–4); (c) Defendant discriminated against Plaintiff by failing to promote him (*Id.* ¶ 13); (d) Defendant discriminated against Plaintiff by paying him less wages and benefits than other employees (*Id.*); (e) Defendant discriminated against Plaintiff through the assignment of work (*Id.*); and (f) Defendant failed to afford Plaintiff the same rights as Caucasian employees to make and enforce contracts. (*Id.* ¶ 12.)

### 3. *New York Human Rights Law*

 The New York Human Rights Law is comparable to Title VII. *Perry v. Manocherian,* 675 F.Supp. 1417 (S.D.N.Y.1987); *Bradley v. Amtrak,* 797 F.Supp. 286, 291 n. 6 (S.D.N.Y.1992) (citing *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Gibson v. American Broadcasting Cos., Inc.,* 892 F.2d 1128 (2d Cir.1989)). The elements of employment discrimination are similar to those under Title VII and courts have relied on Title VII case law and applied it to cases arising under the NYS Human Rights Law. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 479, 102 S.Ct. 1883, 1896, 72 L.Ed.2d 262 (1982); *State Office of Mental Health v. State Div. of Human Rights,* 210 A.D.2d 686, 619 N.Y.S.2d 874, 876 (3d Dep't 1994); *Pace College v. Commission on Human Rts.,* 38 N.Y.2d 28, 377 N.Y.S.2d 471, 339 N.E.2d 880 (1975).

 In order to prevail in an employment discrimination action "a plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. If he is successful, the 'burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Smith v. American Express Co.,* 853 F.2d 151, 154 (2d Cir.1988) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S.

792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)); *Mental Health,* 619 N.Y.S.2d at 876. If the defendant succeeds in establishing such a reason, the plaintiff, who retains the ultimate burden of persuasion, must have "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Mental Health,* 619 N.Y.S.2d at 876. As the non-moving party, the plaintiff has the burden of coming forward with specific facts showing the existence of a genuine issue of fact for trial. Fed.R.Civ.P. 56(c).

### a. Termination of Plaintiff

 To establish a prima facie case of discriminatory termination, the plaintiff must demonstrate that he was a member of a protected class, that he was qualified for the position, that he was discharged, and that there is evidence of disparate treatment from which the court may infer that discrimination caused the discharge. *Mental Health,* 619 N.Y.S.2d at 876; *Sorlucco v. New York City Police Dep't,* 703 F.Supp. 1092, 1098 (S.D.N.Y.1989), *aff'd in part and rev'd in part on other grounds,* 888 F.2d 4 (2d Cir. 1989). "Such cause can be inferred from documentation of satisfactory performance, *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985 [sic]), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), or from evidence that the plaintiff was replaced by a person outside the protected class." *Sorlucco,* 703 F.Supp. at 1098. Here, the Plaintiff is an African–American, which qualifies as a protected class under Title VII. *McDonnell,* 411 U.S. at 801, 93 S.Ct. at 1823–24. The Plaintiff was discharged. Hence, Plaintiff easily meets at least two requirements for a prima facie case. However, Plaintiff has failed to show any evidence of disparate treatment from which the court may infer that discrimination resulted in his termination. Plaintiff's deposition reads as follows: [13]

---

**13.** The Court will refer to the Plaintiff's deposition for evidence to support his claims. Plain-

tiff's motion papers are utterly devoid of any helpful evidence.

Q. Mr. Leslie, why do you believe that your termination was because of your race?

A. Well, I feel my race had a lot to do with the termination because of previous happenings within the company.

Q. What were those previous happenings?

A. ... the way the promotions were handled ... and how duties were handled.

Q. Anything else?

A. No.

Q. ... I am trying to find out what about promotions and positions given out caused you to believe you were terminated because of your race?

A. [A white worker was having problems and I believe they were trying to get him in a safe spot so they could] secure a position for him and get rid of me.... [The white employee, Claude Sitbon, was having problems, including complaints from customers, and my supervisors attempted to get us to switch shifts].... [Roy Stoeckel, the supervisor,] just asked me if I would like to work on Claude's shift.

Q. What did you say?

A. I told him yes, I would....

(Pl.'s Dep. at 55–58.)

Q. [Was there anything else that made you think you were terminated based on your race?]

A. Well, I just feel I was discriminated because of how the whole situation was handled. Claude was promoted, he is being promoted, I think he is being pushed. He has worked for the company less time than I have and he has been promoted to a senior CE at a faster rate.... I don't think I said I was discharged because of my race, but I had said I think I was discharged because of a false drug test, that's the reason for being discharged, not solely because of my race.

Q. Well, was the false drug test manufactured because of your race?

A. Yes, I feel that way.

Q. Why, what causes you to believe that a false drug test was manufactured because of your race?

A. Because I was terminated for using drugs. I don't use drugs.

Q. Any other reason that you believe that was because of your race?

A. Well, within the company, I feel that they don't put blacks into—blacks don't get a chance to move into senior positions in terms of being managers. I don't see a lot of that happening in the company in terms of getting senior positions.

(Pl.'s Dep. at 63–65.)

Q. [Anything else?]

A. Well, I get a feeling that—I feel that BancTec prefers to have white people represent them or a white co-worker to be more representative of them.

(Pl.'s Dep. at 66.)

Q. Did Mr. Stoeckel say anything to you that indicated that he wanted you to move to a shift because of your race?

A. Because of my race, no, he didn't say that.

Q. Did he ever say anything to you that caused you to believe that he would want to fire you because you are black?

A. No.

Q. Did anyone in management ever say anything to you that indicated they wanted to fire you or mistreat you because of your race?

A. No.

(Pl.'s Dep. at 67–68.)

Q. ... What information do you have that indicates that a false drug test was manufactured?

A. Well, the only information is that I know I don't smoke so I don't know how it could come up with a positive drug test.

Q. Other than that, do you have any other information?

A. No.

(Pl.'s Dep. at 81–82.)

Although not forcefully argued by the Plaintiff, these are the only statements that could possibly support his claim that Defendant's reason for termination was

based on race.[14] However, Plaintiff's statements are simply conclusory allegations unsupported any where in the record. There is no evidence from which the Court can draw an inference of discrimination. Plaintiff's statements are based on his feelings alone; and although they may be valid, they are insufficient to satisfy the requirement under Fed.R.Civ.P. 56(e). Plaintiff has failed therefore to prove a prima facie case.

Furthermore, assuming arguendo the Plaintiff had established a prima facie case,[15] the Defendant argues Plaintiff was terminated pursuant to Defendant's Drug Policy, because he tested positive for marijuana on a random drug test. The Second Circuit held that summary judgment in a Title VII case is warranted where the plaintiff can supply no evidence that his employer's justification was a pretext. *Smith*, 853 F.2d at 154.

■ Plaintiff has failed to discount the Defendant's reason for firing him; he has failed to supply any evidence to support a finding that his employer's justification for terminating him is merely a pretext for discrimination. Plaintiff does not deny there was a drug test or that he was aware of the policy, (Pl.'s Dep. at 12–13); instead, Plaintiff alleges that a second confirmatory test was

not done in accordance with the Defendant's policy. However, the Plaintiff is mistaken because the second gas chromatography/mass spectrometry test did occur. (MacFarlane Aff. Attachment F; Mills Aff. ¶ 8.)[16] Other than this allegation, Plaintiff denies that he uses or used drugs, that in the past he tested negative on a drug test, and that there may have been problems with the way the test was conducted. Pl.'s Dep. at 82; *see* Pl.'s Dep. at 32 ("Q. Is there any legitimate medical reason for you to fail the drug test that you know of? A. No, no reason to fail the drug test.") However, Plaintiff offers no evidence to support his contention. Again, these allegations are insufficient to satisfy the requirement under Fed.R.Civ.P. 56(e). Furthermore, as will be shown, none of the following acts support Plaintiff's claim of discriminatory termination.

### b. Defendant Harassed Plaintiff

Plaintiff claims that he was subject to harassment because he was forced to change work shifts. In his deposition testimony cited above he testified that he changed shifts with a white co-worker. Plaintiff took the night shift and was happy with the change.

---

14. In the following sections the Court examines further claims of racial discrimination. Each allegation could be used as further evidence of racial discrimination and therefore could support Plaintiff's claim that he was terminated based on his race. However, the Court finds, for the reasons stated herein, that each one is unsupported; hence, there is no reason to discuss each one twice.

Other evidence Plaintiff puts forth is that his co-worker, Claude Sitbon hurled racial slurs at him once. (Pl.'s Dep. at 68.) However, he never told his employer about the slurs. Racial slurs that an employer does not know about are not actionable. *State Div. of Human Rts. v. General Motors Corp.*, 78 A.D.2d 1006, 433 N.Y.S.2d 904, 905 (4th Dep't 1980), *aff'd*, 54 N.Y.2d 905, 445 N.Y.S.2d 150, 429 N.E.2d 829 (1981); *State Div. of Human Rts. v. Henderson*, 49 A.D.2d 1026, 375 N.Y.S.2d 497, 498 (4th Dep't 1975).

Finally, Plaintiff feels he was discriminated against when the engineer-in-charge, Morris Yukovich, made a statement about Plaintiff being late. A. Well, there are times when I asked for like a day off or I would call in sick and then when I come back to work, he would say something

like you were bullshitting or you weren't really sick, something like that. Q. Anything else? A. No. (Pl.s' Dep. at 74.) The Court finds this cannot support a claim for racial discrimination.

15. At his deposition Plaintiff was questioned about several outstanding performance evaluations given by his supervisor. The Court could infer from Plaintiff's obvious good work that his termination was due to racial discrimination.

16. Plaintiff argues in his papers that when an employer does not follow its policy that in itself is evidence that can be used to infer discrimination. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1227 (2d Cir.1994). While this is correct it is not applicable to the situation here because Defendant followed its procedure sufficiently. Plaintiff's urine was tested by a second confirmatory test as is stated in the Drug Policy. Furthermore, Plaintiff's supervisor did talk to him about the test and Plaintiff did not offer a medical explanation at the time, nor does he offer one now, for why his test would be positive.

His co-worker took the day shift. His further deposition testimony is as follows:

Q. Mr. Leslie, in the document that is called a complaint that was filed on your behalf, it says that you were harassed to force you to change a work shift with a white employee. What did Mr. Stoeckel do that was harassment?

A. Well, he didn't ask me to change. When I was asked again to change a shift, this was like four months later[,] to again change shift with Claude, I was asked by Morris [Yukovich, EIC] on several occasions. Claude would say to me when am I going to give up the shift on more than one occasion.

Q. Let me make sure I understand. Prior to Roy [Stoeckel] asking you to change a shift in about November of 1993, you had had other discussions with Claude and Morris about changing shifts?

A. No. After that, because what happened is that Claude wanted to again change the shift. They wanted to put him back on to the 3:00 to 11:00 which I was now doing.

Q. Did you want to do that?

A. No. I told him no on several occasions. . . .

Q. What did Morris then do that you view as harassment?

A. Well, they continued to ask me if I wanted to change shift, even after I told them that I was comfortable, I didn't want to change again.

Q. So you are saying that because Morris asked you more than once if you would be willing to change the shift, you view that as harassment?

A. Well, Claude was constantly badgering me about changing a shift.

Q. But Claude is not your supervisor?

A. Right.

Q. . . . How many times did Morris ask you?

A. Morris asked me about three times. . . .

Q. Other than asking you three times, did Morris do anything else that was harassment or badgering? . . .

A. No.

(Pl.'s Dep. at 70–74.)

These facts do not support a racial harassment claim. As an act of discrimination, nothing is forwarded to show any connection between racial discrimination and the requests to change shifts.

### c. Whether Plaintiff Was Not Promoted Due to His Race

Plaintiff claims that he was discriminated against because he was not promoted like other employees. His testimony is as follows:

Q. Your complaint says that you weren't promoted to the extent and degree to which white employees are promoted. Other than senior CE, what position was there available to you to be promoted to?

A. EIC, probably.

Q. . . . [Y]ou said you were promoted approximately four years ago, correct?

A. Yes.

Q. After that period, what EIC position became available that you were qualified for?

A. EIC, well, I think there was only one at the time that came up.

Q. What EIC was that that you were qualified for?

A. Well, the position that is now held by Morris [Yukovich].

Q. . . . What made you qualified over Morris to be the EIC?

A. I think I had knowledge of more equipment than him. . . . I had a longer length of service than he has.

Q. Anything else?

A. No.

(Pl.'s Dep. at 74–76.)

To state a claim for discrimination based on a discriminatory failure to promote, the plaintiff must show that he is a part of a protected class, that he applied for the job and was qualified, that he was rejected and that the position remained open. *Perry v. Manocherian*, 675 F.Supp. 1417, 1424 (S.D.N.Y.1987) (citing *Hudson v. IBM Corp.*, 620 F.2d 351, 354 (2d Cir.), *cert. denied*, 449

U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980)).

■ Plaintiff was promoted from Customer Engineer to Senior Customer Engineer within one year of beginning his employment with Defendant. (MacFarlane Aff. ¶ 42.) Claude Sitbon, a white employee who was in a comparable position to Plaintiff, was promoted three and one half years after beginning work with Defendant and more than two years after Plaintiff. (MacFarlane Aff. ¶ 43.) Hence, there is no discriminatory promotion claim with regard to the Plaintiff's promotion to senior CE.

Regarding the EIC or engineer-in-charge position, Plaintiff does not even know when the position was available and obviously did not apply for it. (Pl.'s Dep. at 75.) Furthermore, Plaintiff's supervisor, Morris Yukovich, who held the EIC position, was hired in 1987 and was promoted to EIC before Plaintiff even began working for Defendant. (MacFarlane Aff. ¶¶ 45–47.) Yukovich was promoted in March 1989. (*Id.* ¶ 46.) Once again Plaintiff has failed to satisfy the four prong test necessary to state a prima facie case of discriminatory promotion.

#### d. Whether Plaintiff's Salary Was a Result of Discrimination

Plaintiff also claims that the Defendant discriminated against him because it paid a similarly situated employee more than Plaintiff. His testimony is as follows:

Q. Who were the white employees that you were underpaid to?

A. Well, I was told by certain employees how much they make. When I compare that to my salary, it was off.

Q. Who told you what they made?

A. My co-worker Claude told me how much he had made.

Q. What did he tell you he made?

A. Well, he told me he made over $40,000 for 1992 and 1993. . . .

Q. Anyone else?

A. I can't say someone that's told me their salary—they would say who was making more than who, the co-workers.

Q. Who were the white co-workers that said that they made more money than you that you were similarly situated to?

A. I was similarly situated to Claude.

Q. Anyone else?

A. No, that I can think of for sure.

(Pl.'s Dep. at 76–78.)

■ Although Plaintiff believed that Claude Sitbon received more salary than he, Plaintiff was mistaken. First, Plaintiff's raises were comparable to that of Sitbon. (MacFarlane Aff. ¶ 50, Attachment H.) Furthermore, Plaintiff's salary was higher three of the four years in which they worked together. (*Id.* ¶ 51.) Sitbon was hired in November 1989. (*Id.* ¶ 43.) Plaintiff was hired in December 1989.[17] Plaintiff was promoted to Senior CE in 1990. (*Id.* ¶ 42.) Sitbon was promoted in May 1993. (*Id.* ¶ 43.) Plaintiff made more money than Sitbon until he was promoted. Plaintiff makes a valid argument that the fact that Plaintiff and Sitbon received almost the same salary although Plaintiff was a Senior CE and Sitbon was only a CE was discriminatory. However, this in itself is not sufficient. Plaintiff does not come forward with any evidence of where the two employees began their salaries nor does he establish that the work they did was sufficiently different. Rather, the record shows that they did the exact same work.

#### e. Whether Plaintiff was Discriminated Against in the Designation of Assignments

Plaintiff also claims the way in which Defendant delegated assignments discriminated against him. His testimony is as follows:

Q. Other than the switch from night shift or from day shift to night shift with Claude, were you discriminated in any other way in terms of your assignments?

A. I would say yes.

Q. How is that?

(MacFarlane Aff. ¶¶ 39–40.)

---

**17.** Plaintiff worked for Computer Entry Systems Corp. which was acquired by Defendant in 1989.

A. ... We are supposed to do what you call preventative maintenance, PMs. When he was on that shift, he didn't do any PMs and it was my opinion about it that he wasn't doing any PMs and nothing was done about that and I would say about a year later when I went to work on that shift, I was told I had to do the PMs so I felt that was discriminatory.... [Also] I don't think I get as much overtime as other people did.... [Also I get less company training than others.]

(Pl.'s Dep. at 78–81.)

As far as the switch of shifts, Plaintiff agreed and was happy with his switch to the night shift. Although asked several times to move back to the day shift he did not do so, nor was he forced to. Other than the conclusory allegations made during his deposition, Plaintiff forwards no evidence to support his contention that others received more overtime or that he received an insufficient amount of training.

### f. Whether Plaintiff's Rights to Make Contracts were Different From Those of White Employees

Plaintiff does not offer any evidence that explains what right he is claiming he was deprived of, nor supports a derivation of any contract right.

## III. CONCLUSION

Plaintiff's Motion to Remand is DENIED. Defendant's Motion for Summary Judgment is GRANTED.

SO ORDERED.